# CHARLESTON.

## STATE v. PRATER.

Submitted June 18, 1902.    Decided December 6, 1902.

1. CRIMINAL LAW—*New Trial—Joint Defendants.*

When on the separate trial of one of three persons jointly indicted for murder, the evidence shows that the accused can be convicted only as principal in the second degree, and that, at the time of the killing, he did no act of violence, and, at the most, was present only for the purpose of aiding, if need be, and there is a conviction of voluntary manslaughter, the appellate court, in determining, on a writ of error, whether a new trial shall be allowed, will consider the evidence introduced, so far as is necessary in disposing of the assignments of error, although it tends to prove the crime of murder, as to which the verdict has wrought an acquittal. (p. 135.)

2. RES GESTAE—*Evidence—Motive.*

In such case, the prior acts, declarations and threats of the accused, even though not a part of the *res gestae*, are admissible in evidence against him when they legitimately tend to establish motive and intention to do the killing, and a common purpose and design on the part of himself and those jointly indicted with him to commit the act. (p. 145).

3. CONSPIRACY.

Proof of conspiracy or the existence of a common design on the part of two or more persons to commit a crime for which they are jointly indicted may be extracted from the circumstances connected with the transaction which forms the subject of the accusation; and, when they are such as fairly tend to prove such conspiracy or common design, they constitute a sufficient foundation for the admission of the acts and declarations of each of the parties as evidence against the others. (p. 144).

4. CRIMINAL LAW—*Co-conspirator.*

Although evidence of the acts and declarations of an alleged co-conspirator be admitted without a foundation therefor having been laid, the judgment will not be reversed for that reason, if the evidence show that *prima facie* the fact of conspiracy has been established. (144).

5. JOINT INDICTMENT—*Separate Trial.*

On a joint indictment of two or more persons, the State, with the permission of the court, may elect to try any or all of them separately. (p. 154).

6. REVERSIBLE ERROR—*Witness—Relation.*

    It is error to permit it to be shown, in the course of a cross-examination as to the relation of a witness to the accused in whose favor she testifies, that she is of illegitimate birth, but the error is not sufficient to reverse the judgment.    (p. 154).

7. INSTRUCTIONS TO JURIES.

    When an instruction given is incomplete, but states the law correctly as far as it goes, and the omitted part is supplied by other instructions given, such omission is not error.    (p. 154).

8. COURT'S INSTRUCTIONS.

    The court is not bound to repeat its instructions and it is not error to refuse to do so.    (p. 158).

9. ERROR—*Instruction.*

    An error in an instruction favorable to the accused, and not such as might mislead the jury to his prejudice, affords him no ground of complaint against the verdict.    (p. 159).

10. SELF DEFENCE—*Criminal Law.*

    The principle of self defense extends to the right of a person to defend a near relative when in immediate danger of death or great bodily harm, and will excuse homicide in such case, when the killing is upon necessity or apparent necessity and the designation of it as self defense in instructions which clearly explain the applicability of it to the case on trial, does not render the instruction improper.    (p. 157).

11. CRIMINAL LAW—*Instruction—Error.*

    The court,, on the separate trial of J. P., having instructed the jury that they might find him guilty of murder of the first degree, murder of the second degree, voluntary manslaughter, or involuntary manslaughter, or acquit him, it appearing from the evidence that D. P. did the actual killing, and the evidence tending to prove that J. P. and L. P., jointly indicted with him, are principals in the second degree, it was not reversible error to give the following instruction:    "The court instructs the jury that under the indictment for the offense wherewith they stand charged, that if either, J. P., L. P., or D. P., did murder C., the defendant J. P. being then and there present, lending his countenance to the commission of said offense, they must find him guilty as charged in the indictment."    (p. 160).

12. INSTRUCTIONS—*Evidence.*

    It is not improper for the court to refuse to give to the jury, as an instruction at the request of the accused, abstract propositions of law, quoted from a text book, and not indicating to what class of evidence in the case it is applicable.    (p. 159).

13. ERROR—*Instructions—Evidence.*

It is not reversible error to refuse to insrtuct the jury that they should consider facts, established by the evidence, in arriving at their verdict. (p. 162).

14. CRIMINAL LAW—*Conspiracy.*

To convict a person as a principal in the second degree, it is sufficient to find that he conspired with the slayer, or joined him in a common design, to kill the deceased, that the killing was done in pursuance of such conspiracy or design, and that the accused was present at the time of the killing for the purpose of aiding therein, if necessary to its accomplishment, and instructions, calculated to impress upon the jury that they must find that he actually participated in the act of killing, are improper and may be refused. (p. 162).

15. ERROR.

It is not improper for the trial court, in overruling a motion to exclude certain evidence, on the ground of inadmissibility, to remark, in ine presence of the jury: "I don't think I ought to give my reasons for this decision. I don't want to give any intimation how I regard it. I simply say I overrule the motion to exclude the testimony." (p. 163).

16. PRINCIPAL—*Second Degree Murder.*

Where the evidence tends to convict the accused as a principal in the second degree, the fact that he had a lawful purpose in going to the place of the killing at the time it occurred, while relevant and material and competent evidence in his favor, is not conclusive of his innocence, nor of the absence of conspiracy on his part. (p. 156).

Error to Circuit Court, Webster County.

Joseph Prater was convicted of voluntary manslaughter, and brings error.

*Affirmed.*

MORTON & WYSONG and JOHN D. ALDERSON, for plaintiff in eror.

THE ATTORNEY GENERAL for the State.

POFFENBARGER, JUDGE:

Joseph Prater, having been convicted, in the circuit court of Webster County, on the 13th day of November, 1901, of voluntary manslaughter, on an indictment for murder, complains of the verdict and judgment against him. The case is peculiar

and difficult, involving some very nice questions of law. The State endeavored to convict the defendant of murder, upon the theory that there was a conspiracy to kill the deceased, Thomas. Conley, and that the defendant was one of the conspirators, and that he, being present at the time of the killing, was a principal in the second degree. Conley was shot and killed by David Prater, a son of the defendant. The killing occurred in the woods where the deceased was cutting timber. Joe Prater and his son, Lum Prater, on the morning of the killing, went together to the place at which Conley was working, each carrying a gun. Upon their arrival a quarrel took place between Joe Prater and Conley, in which Conley was the aggressor, cursing and abusing Prater, while the latter remonstrated with him and apparently endeavored to avoid trouble. During the progress of the quarrel a voice was heard from a place about twenty steps away in the brush, calling, "Are you ready to go?" or "Come on boys, let's go," or "Come on, Pap, are you ready?" or "Are you ready Pap?" or "Pap, are you ready?" As to the exact words, the witnesses differ. The defendant, Joe Prater, answered by calling out, "In a minute," or "Yes, in a minute." At or about that time, the accused was seated on a log and the deceased on the ground at the root of a tree which he and another had commenced sawing down. At or near that time, the deceased got up with an axe in his hand. But whether he had it in his hand at the time he was shot or had stuck it in the tree, or had dropped it on the ground, there is controversy. Upon rising he said, "By God, I might as well die now as at any time," or, "By God, if a man has got to die, he might as well die now as at any time. I am not afraid of you all if you have got your guns," or something similar to that. Just what he said and whether his words related to himself or the accused are involved in contradiction and doubt. Immediately after he rose, Dave Prater, who had called to his father, shot Conley dead, firing three shots, one of which passed through the heart, another struck him in the mouth and the third probably tore the clothing of the deceased across the abdomen but did not break the skin. Some of the witnesses recognized Dave Prater before the shooting occured. Whether the accused and the deceased did, is not known, but before the completion of the firing the defendant recognized his son and called to him saying,

"Quit that, Dave, look what you have done," or something simi-
lar. An expression, "Lord, have mercy. Look what you have
done," was used either by the accused or by the deceased. As
to which there is conflict. Immediately after the killing, Joe
Prater and his son, Lum, left the scene, going up the hill,
some of the witnesses say, running, and others, walking very
fast, taking their guns with them.

The evidence of conspiracy is substantially as follows:
Letcher Young testifies that, on a Sunday night, about three
weeks before the killing, he and his wife were at Joe Prater's
house. After making some jocular remarks about fighting,
Young was called out on the porch by Dave Prater and they
were followed out by Amos Prater, another son of the accused.
There, Dave detailed to Young a quarrel which Lum Prater had
had that day with Conley, and wanted to buy witness' revolver
to defend Lum Prater. Witness also heard Joe Prater say Con-
ley was a man they had no use for and that they must get rid
of him. On the following Tuesday, witness was again at Prater's
house and Joe Prater told him he had been at Tom Conley's the
night before, said something about trading for the last gun Con-
ley had, and also that Conley and his boys had gotten into
trouble and that it would not do for Conley "to monkey with
his boys too far," and that he was a man they had no use for
and they were going to get rid of him. Witness was at Joe
Prater's house on the morning of the killing. While there he
heard a quarrel between Joe Prater and one Dock Hammonds
in the road near Joe Prater's house. Then he went in the house
and found Dave Prater standing with a bridle in his hand. Joe
Prater, Lum Prater, Dock Hammonds and Samp Hammonds
having passed on after the quarrel in the direction of where
Conley was working. Dave Prater, after Young went in, ex-
amined two or three guns that were setting in the house and
took one of them and went out with it, walking fast and, after
leaving the yard gate, running. At the time of selecting the gun,
he asked witness two or three times if he would see three or four
or five jump on his father and beat him up, to which witness
replied in the negative.

Sarah E. Young, wife of Letcher Young, testified that she and
her husband were at Joe Prater's house on a Sunday evening
two or three weeks before the killing and that she heard Joe

Prater say Conley was a man "that must be got rid of." Mitchell Roe says that two or three weeks before the killing he met Lum Prater and told him he had heard that he and Conley had had trouble, to which Lum replied, "Yes, we did, and it ain't over with yet," and that he would kill Conley or that Conley would be killed before two weeks. Samp Hammonds testified that when he went to Prater's house on the morning of the killing he found Joe, Lum and Dave all there oiling and cleaning up their guns. This was on Monday morning, and the Praters had returned on the preceding Saturday afternoon from a trip of about a week in the mountains on a hunting expedition. Samp Hammonds left the house with Joe Prater and Lum Prater and he says that, as they were leaving, he heard Joe Prater say, "Dave, don't forget your business," but he did not know what he meant. When these three reached the road they were met by Dock Hammonds, between whom and Joe Prater there was a quarrel about Alderson Milam, a homeless boy, who had been staying with Prater and had accompanied him on the hunting trip to the mountains where Prater whipped him for disobedience. The boy being a brother-in-law of Hammonds, the latter came to see Prater about his having whipped him. After this quarrel, Joe and Lum Prater and Samp and Dock Hammonds all proceeded along the road in the direction of the place at which Conley was working. The two Hammonds were also working in timber at or near that place. Joe Prater and Samp Hammonds were both interested in a certain lot of timber which had been cut and Joe Prater was going to this particular lot of timber to help to scale it that morning. Lum Prater, it is claimed, was going to Stout's mill and thence to Camden on Gauley. The understanding when they left the house was that Dave Prater intended to go that day to Stout's mill. After the parties who had started together toward the place at which Conley was working, had gone some distance, Samp Hammonds turned back, saying he had forgotten a pair of check lines which he had hidden under a log. As he went for the lines he met Dave Prater who first asked him where Conley was, and then which way his father and Lum had gone. He was traveling at a rapid pace which witness termed "a long trot" and hardly halted or checked his pace. Witness gave him the direction in which his father and brother had gone but he turned into another road to the left. It is admitted that the

quarrel which took place between the accused and the deceased at the time of the killing was concerning an order which Conley had expected Prater to leave at his (Prater's) house for him when Prater went to the mountains, or that Prater was to authorize his wife to give Conley. Joe Prater had had a contract to cut timber for T. W. Blankenship. As to the hemlock timber, he turned this contract over to Conley and his son, Dave Prater, and, at the same time, loaned Conley five dollars. While Prater was in the mountains, Conley needed supplies. Prater had promised to authorize his wife to give Conley an order for two dollars, but had forgotten to do so. Conley sent for the order but did not get it. Alderson Milam testified that when Prater came back from the mountains his wife told him that Conley had come for the order, and, not receiving it, had said Prater had acted a rascal with him, and that Prater had said that Conley would have to be killed and he might as well kill him as anybody else. Dave Prater was not with the others who went to the mountains. He was a co-contractor with Conley and, it seems, worked with Conley during that week. When Conley learned that Joe Prater had not left the order for him, he denounced him as a rascal and that offended Dave and he sold his interest in the contract to John Beal.

In view of the evidence, this verdict of voluntary manslaughter is apparently a contradiction in itself. All the evidence against the accused tends to prove murder. There may be a principal in the second degree in voluntary manslaughter. 1 Hale 446, 4 Blk. 34; *State* v. *Davis,* 1 Houst. Cr. Cas. (Del.) 13; 21 Am. & Eng. Ency. Law (2 Ed.) 172; *State* v. *Harman,* 117 Mo. 629, modifying *State* v. *Philips, Id.* 389. But the very nature of the crime excludes the existence of a conspiracy to commit it. It is impossible to conspire together to take the life of a human being without willing, deliberating and premeditating the taking of life. Voluntary manslaughter is the intentional taking of life without malice, without premeditation, without deliberation. 9 Am. & Eng. Enc. Law, 578; 4 Blk. 191. Nor in manslaughter can there be an accessory before the fact for the same reason. 4 Blk. 191. Logically, this verdict says there was no conspiracy for, if the jury had found that the accused conspired with his two sons to kill the deceased, and, in pursuance thereof, he was killed by one of them, all being present at the time, as they were, they were

bound by their oaths to find the accused guilty of murder in the
first degree. But they have acquitted him of that crime. While
the verdict does not say in terms that the jury found him not
guilty of murder, the finding of guilty of voluntary man-
slaughter operates an acquittal of any higher crime included in
the indictment. Should this verdict be set aside and a new trial
awarded, the new trial would be limited to the charge of volun-
tary manslaughter and lower offenses included in the indictment.
On the second trial the charge of murder would be eliminated.
*State* v. *Cross,* 44 W. Va. 315; 11 Am. & Eng. Enc. Law 940;
1 Bish. New Cr. Law 1056; Whar. Cr. Pl. & Pr. 445; *Lithgow's
Case,* 2 Va. Cas. 297; *Bennet's Case,* 2 Va. Cas. 295; *Kirk's
Case,* 9 Leigh 627; *Stuart's Case,* 28 Grat. 950.

The verdict being conclusive and final as to the nature and
degree of the offense of which the defendant can be convicted,
is it also conclusive of the facts involved in the issue from which
guilt can be inferred? Would all evidence, tending to prove
murder, be excluded from the jury in a second trial upon this
indictment, in case the verdict of voluntary manslaughter should
be set aside? If so, must it not be excluded upon the inquiry
as to whether there is any evidence to support the verdict as it
stands? To these questions, the authorities do not respond very
satisfactorily. In *State* v. *Cross,* 44 W. Va. 315, JUDGE BRAN-
NON, says at page 319: "Upon an indictment for murder, the
jury can find the defendant guilty of murder in the first or sec-
ond degree, or voluntary or involuntary manslaughter. It not
only can, but must, consider and decide of what degree
of criminal homicide, if any, he is guilty; and, when
once it decides that he is guilty of voluntary manslaughter,
it logically and inevitably follows, in a legal point of
view, that the jury considered the whole scope of the
case, all the degrees of the offense, and found him not
guilty of a degree of crime above voluntary manslaughter.
If guilty only of manslaughter, he cannot be guilty of murder,
as his act is found free of that element indispensable in murder,
malice aforethought." This seems to imply that the verdict of
not guilty of murder is conclusive of the non-existence of malice,
purely a matter of fact . But it must be borne in mind here that
the learned judge was discussing the conclusiveness of the ver-
dict as to the degree of the offense and not the question whether it

negatived the existence of facts sufficient to constitute murder. At page 321, he uses the following language which seems to indicate that he doubted the conclusiveness of the verdict as regards the facts·involved in the issue: "In murder in the first degree there is malice, and willfulness, deliberation, and premeditation; and whether a verdict of murder in the second degree is to be held as finding only malice and negativing willfulness, deliberation, and premeditation, I do not say." In *Livingston's Case,* 14 Grat. 592, Daniels, J., in discussing *Balls' Case,* 8 Leigh 726, and *Gwatkin's Case,* 9 Leigh 678, which were remanded for new trials without direction or limitation as to the charges upon which the new trials should proceed, indicating that the defendant might be retired upon the higher offenses charged in the indictments, after stating some supposed reasons for so construing those decisions, says, at page 609, "If this view does not present a mere technical and unsubstantial difficulty which may be gotten over by modifying the charge to the jury, so as to restrict their inquiry and finding to the grades of offense below murder in the first degree, it is obvious that there may be reasons for the supposed decisions in the cases of Gwatkins and Ball, that do not apply to this. For where a party is found guilty of manslaughter only, you may suppose him not guilty (as by legal consequence he in fact is) of some of the most important allegations of the indictment; and you may strike out, or suppose to be stricken out the most important words; as for instance, 'murder,' and 'of malice aforethought,' and still leave an indictment which would contain the charge of manslaughter." But as in *Cross' Case,* the discussion here does not proceed beyond that of the effect of the verdict in relation to the degree of the offense. It stops short of indicating what evidence may be given upon a new trial or what facts may be established from which the inference of guilt of the lesser offense may be inferred. Patient investigation fails to disclose any authority bearing directly upon this question. The authorities go so far only as to hold that no matter how clearly guilty the accused may be, his acquittal by a jury is not reviewable, that he cannot be retried for the same offense, and that his asking a new trial when convicted of manslaughter, or other minor offense upon the indictment, does not amount to a waiver of his immunity from a second trial for the higher offense of which he has been acquitted. These propo-

sitions do not result from any ascertainment of the facts found by the jury, or the evidence considered by them in arriving at the verdict, but from that common law maxim, now converted into a constitutional guarantee which prohibits the putting of a man's life or liberty in jeopardy the second time for the same offense. "Nor shall any person, in any criminal case, be compelled to be a witness against himself, or be twice put in jeopardy of life or liberty for the same offense." Const. W. Va., Art. III, s. 5; 5th Amendment to Const. U. S.

This forbids a writ of error to the State when the verdict is in favor of the prisoner. It prevents a retrial for any offense charged in the indictment of which the prisoner is acquitted. To permit the State to have a verdict and judgment against it in a criminal case reviewed and a new trial would deny to the prisoner the benefit of this constutional provision. Only those findings and judgments which are against the prisoner and in favor of the State can be reviewed, and when the prisoner asks for a new trial, he waives the benefit of the provision by consenting to be again put in jeopardy for the offense of which he has been convicted. This binding force of a verdict results not from any power by law vested in the jury. In criminal cases, the power of the jury is not above the law nor the court. They are the judges of the facts and not of the law. *State* v. *Dickey,* 48 W. Va. 325. They must take the law from the court and the court, in giving the law, is bound by its limitations. The law stands above both court and jury. By disregarding the law and their oaths the jury, by their physical power, may acquit a guilty man and their verdict is final and conclusive, but it is not because they had the legal right to do so. It is only because the constitution says a party so acquitted cannot be retried. "The popular impression is, that this power to definitely close a prosecution by an acquittal, arises from a right on the jury's part to decide the law as well as the facts according to their own sense of right. But it arises from no such thing. It rests upon a fundamental principle of the common law, that no man can be twice put in jeopardy for the same offense. No matter from what cause an acquittal results, the defendant cannot be retried. If, for instance, it should result from a usurpation by the court of the facts of the case, which undoubtedly belong to the jury, the acquittal would be final; and yet it would be very improper to

draw from such a result the assumption that the disposition of the facts belongs to the court. It is important for you to keep this distinction in mind, remembering that while you have the physical power, by an acquittal, to discharge a defendant from further prosecution, you have no moral right to do so against the law laid down by the court. The sanctity of your conclusion in case of an acquittal, arises not from any inherent dominion on your part over the law, but from the principle that no man shall be twice put in jeopardy for the same offense." Rogers, Judge, charging the jury in *Commonwealth* v. *Sherry,* quoted in 3 Whar. Am. Cr. Law, s. 3106.

In this constitutional provision, then, and not ·in the legal powers of the jury nor in the facts found by them on the trial, is the basis of the principle which precludes a second trial for an offense of which the prisoner has been acquitted. The application of the principle does not require the ascertainment by the rules of logic of what matters of fact the jury found and determined in reaching their conclusion. While the plaintiff in error can never again be tried for the murder of Thomas Conley, if the verdict of which he complains should be set aside and a new trial awarded, the case would go back for trial upon the same indictment with the limitation that the highest offense of which he could be convicted under it is voluntary manslaughter, and, as Judge Daniel said in *Livingston's Case,* cited, it is in the power of the court to restrict the enquiry and finding of the jury to the grades of offense not above voluntary manslaughter. The constitutional provision only prohibits a second trial of the accused on the charge of murder contained in the indictment. It is silent as to the form of the indictment upon which the second trial for an offense not within the terms of its inhibition may be had and also as to the evidence that may be admitted. If it is to be carried further than this, one of the results would be great inconvenience, at least, in the second trial. Indeed, there are many conceivable cases in which no evidence could be introduced on the new trial, and this one falls within that class. The principle would operate as an acquittal of every thing charged in the indictment, for the circumstances are such that, without introducing evidence of the conspiracy, association or common design, tending to prove the accused guilty of murder, the State would be entirely without evidence. Suppose a case in which the

uncontradicted evidence is that the accused, by lying in wait and deliberately planning and premeditating murder, took human life and the evidence is complete, full and conclusive, and upon that evidence, the jury finds a verdict of voluntary manslaughter. Here, all the evidence imports murder. None of it harmonizes, in any sense or in any degree, with the theory of manslaughter, except as an inclusive offense. Must the verdict be set aside, a new trial awarded on the charge of manslaughter and minor degrees, and, on the new trial, the introduction of evidence be limited to such only as does not tend to prove murder? Suppose a case in which there is complete proof of a conspiracy to take life and, of the execution of that conspiracy by one of the parties, the others being present for the purpose of aiding but doing no act at the time and the verdict as to all the conspirators is voluntary manslaughter. Must all be turned loose except the one who actually did the killing? This would be according to the jury power and authority which the law does not give. In such cases, the jury refuses to wholly perform what is required of them by the law. They illegally acquit and discharge the accused as to the higher degrees of crime charged in the indictment, after having found the prisoners guilty. They have not exceeded the law but stopped short of the law and of their duties. In other words, without warrant of law or moral right, they have exercised clemency and dispensed, what they conceived to be, mercy. As said before, in such cases, the verdict is a contradiction in itself. It says the accused is not guilty of the crime which the evidence tends to prove, but it says he is guilty of an inclusive offense which, if the evidence tending to prove the higher offense is to be excluded, entirely remains wholly unsupported by evidence. It holds the accused both guilty and not guilty. Logic is utterly powerless to extract the verdict from its inconsistencies. To attempt to do so, by excluding from the inquiry into the legality of the verdict and judgment, all the evidence tending to prove the higher offense of which the accused is acquitted results in absolutely freeing a man whom the jury have said is guilty but, as to the offense of which he is guilty, they have blundered or arbitrarily fixed it at a minor degree out of mere humanity or a desire to be merciful.

These views and the principles hereinbefore referred to result in the conclusion that, upon this motion for a new trial, the

evidence and facts tending to prove murder are to be considered, and, if it is found that there is sufficient evidence to have upheld a verdict of guilty of murder, had the jury rendered such a verdict, the verdict which they did find cannot be set aside, unless for some error sufficient to reverse.

The assignment of error most firmly relied upon by the plaintiff in error, and next in logical order, is the admission of evidence of the acts, declarations and threats of David Prater, Lum Prater and the accused, tending to establish conspiracy. The contention that the court erred in admitting this evidence is based upon two grounds; first, that a *prima facie* case of conspiracy was not shown; and second, that this evidence tended to prove that the accused was an accessary before the fact, and not a principal in the second degree, the proceeding being against the accused as a principal. Evidence of some of these acts and declarations may have been admitted before a *prima facie* case of conspiracy had been made, out, but the rule which requires postponement of the introduction of such evidence until after proof of the conspiracy, relates to the order of the introduction of testimony, and whether it is enforced or not, is wholly immaterial, if the conspiracy is finally made out in the proof. "While it is usual to first introduce the evidence of the conspiracy before the proof of such acts or declarations is offered, yet the order of introduction of the evidence is in the discretion of the court, and in such discretion the acts or declarations may be received subject to the production of subsequent proof of the conspiracy which will make them available as against the defendant." McClain Cr. Law, s. 989. "Although such evidence of the declaration of an alleged co-conspirator be admitted without such foundation being laid, yet the judgment will not be reversed for this reason, if the facts proved, or evidence certified show that *prima facie* the fact of conspiracy had been established." *Cain's Case,* 20 W. Va. 679. Another important principle asserted in *Spies* v. *People,* 122 Ill 1, (*The Anarchists' Case*) is, that where the prosecution is not for the conspiracy, as a substantive crime, proof of conspiracy is only proper so far as it may tend to show a common design. It may be introduced for the purpose of establishing the position of the members of the combination as accessories to the crime. 4 Am. & Eng. Law 630. It is also well established that such foundation may be laid, a

*prima facie* case of conspiracy made out, by circumstantial evidence, and that slight evidence of collusion is all that is required. 4 Am. & Eng. Enc. Law, 629. Another important principle applicable to cases of this kind is, that the prior acts, declarations and threats of the accused, even though not a part of the *res gestae,* are admissible against him when they legitimately tend to establish motive and intention to commit crime. McClain Cr. Law, 419; *State* v. *Shepard,* 49 W. Va. 582, and authorities there cited. As this is not a prosecution for conspiracy as a substantive crime, but for murder in which the conspiracy, if any, takes a subordinate place and is to be considered merely as one of the facts tending to prove the guilt of the accused, the admissibility of the acts and declarations in question, is to be considered in the light, not only of the law relating to conspiracy, but also in that of the other principles just mentioned. In other words, grounds of admission of such testimony in cases of this class are broader than in those cases in which conspiracy is the gravemen of the charge. Persons may be associated as principals of the first and second degrees in the commission of a murder or other crime without being, in a technical sense, conspirators, although conspiracy is generally one of the facts found in reaching the conclusion of guilt. The following, found in the 6th point of the syllabus in *St. Clair* v. *United States,* 154 U. S. 936, on the trial of St. Clair on an indictment charging three persons with murder, seems to be in perfect harmony with this view : "On the trial of an indictment charging three persons jointly with having committed murder, the acts, appearances and declarations of either, if part of the *res gestae,* are admissible in evidence." On the trial of St. Clair, the acts and declarations of his associates, before and immediately after the perpetration of the crime, were admitted against him. Mr. Justice Harlan, who delivered the opinion of the court, did not, in disposing of the exceptions to the admission of this evidence, treat the parties as conspirators. Among other things, he said, "Circumstances attending a particular transaction under investigation by a jury, if so interwoven with each other and with the principal fact that they cannot well be separated without depriving the jury of proof that is essential in order to reach a just conclusion, are admissible in evidence. 'These surrounding circumstances constituting part of the *res gestae,*' Greenleaf says, 'may always

be shown to the jury along with the principal fact, and their admissibility is determined by the judge according to the degree of their relation to the fact, and in the exercise of his sound discretion; it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description.' " On the same subject he quotes Whar. Ev., s. 259, as being applicable also. It reads in part as follows: "The *res gestae* may be, therefore, defined as those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of any one concerned, whether participant or bystander; they may comprise things left undone as well as done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculating policy of the actors. In other words, they must stand in immediate causal relation to the act—a relation not broken by the interposition of voluntary individual wariness seeking to manufacture evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act." It is not intended here to hold all the acts and declarations in question to be parts of the *res gestae,* but some of them probably are.

If there were no evidence, independent of the acts and declarations of Lum Prater and Dave Prater, tending to implicate the accused in the killing of Conley, evidence of them might be inadmissible. But that is not the status of this case. As has been shown, witnesses, with whose credibility the court has nothing to do, as that is a matter for the jury alone, have testified that, shortly before the tragedy, the accused threatened the life of the deceased; that on the morning of the killing all three of the parties were together oiling and cleaning their guns at the house of the accused, although the other two did not reside there, one of which guns it was competent for the jury to infer, was the one from which the fatal shots were fired by Dave Prater, while the other two were at the scene of the killing at the time of the killing, in the hands of the accused and Lum Prater; that

upon leaving the house less than an hour before the killing oc-
curred, and when starting upon the journey which ended at the
place of the killing, in company with Lum Prater, the accused
said to the slayer, who remained behind for a few minutes, "Dave,
don't forget your business," or words of similar import; and
that immediately before the deceased was killed by Dave Prater,
the latter had called from the brush to the accused, saying, "Are
you ready?" to which the accused replied, "In a minute." These
were acts of the accused himself directly connected with, and re-
lating to, the crime charged against him. Independently of any
other declarations made by Dave Prater or Lum Prater, they as-
sociate the accused with the slayer at the very time of the killing,
either innocently or criminally, the latter if the jury believed the
evidence of the witnesses who have testified to the acts and decla-
rations of the accused himself hereinbefore set out. From these
facts the jury were warranted in drawing the inference that the
accused knew the death of Conley was then and there to be ac-
complished by his son; that the accused had counseled and di-
rected it, and that he was upon the ground fully prepared and
intending to aid in the consummation of it, if necessary. The
finding of such facts made the accused a principal in the second
degree whether a conspirator or not. "The distinction between
principal and accessary before the fact is this: The principal is
the one who actually does the criminal act or participates in the
doing of it, whether actually or only constructively present, or
who is actually present at the time of the doing of it, aiding and
abetting; while the accessory is one who has such connection with
the crime, by reason of preparation, procurement, advice, or en-
couragement, as to be deemed criminally liable therefor, but does
not participate in the final commission of the crime and is not
present thereat." McClain Cr. Law, s. 204. The author dis-
tinguishes here between principal and accessory without dis-
tinguishing between principal of the first degree and principal
of the second degree. In the next section this latter distinction
is made, and of the principal in the second degree, he says, "To
constitute this form of connection with the offense, the accused
must have been present when the offense was committed, al-
though, as will be seen in the next paragraph, this presence may
be constructive. Mere presence, however, is not enough without
some form of participation. But those who, being present, aid

and abet, or are present for that purpose, although, they actually do no wrongful act whatever, are principals in the second degree." There being sufficient evidence, as has been shown, to make the accused an associate with the slayer in the killing of the deceased, it is by no means apparent that the admission of evidence of the acts and declarations of his two associates, dating back to but a few days before the killing, and establishing threats on their part to do the very act which the accused himself had threatened to perform, and making preparation for its execution, would do violence in the slightest degree to the principles of law laid down by the highest authorities on the subject of the admissibility of the acts and declarations of coconspirators. As conspiracy may be established by circumstantial evidence, and there is sufficient evidence from which the jury might infer the association of these parties in the design to kill the deceased, it seems clear that this is amply sufficient to make out a *prima facie* case of conspiracy, upon which ground the acts and declarations of Luin Prater and Dave Prater are admissible in evidence. To this phase of the case, the following from section 93 of 3 Greenleaf Ev. applies with great force: "The evidence in proof of a conspiracy will generally, from the nature of the case, be circumstantial. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion, that they were engaged in a conspiracy to effect that object." In 1 Greenleaf Ev., 6 Ed., section 111, it is said: "Here a foundation must be first laid, by proof, sufficient in the opinion of the judge, to establish *prima facie,* the fact of a conspiracy between the parties, *or proper to be laid before the jury, as tending to establish such fact.* Connection of the individuals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all; and is therefore original evidence against each of them." The evi-

dence for the State tends to connect each of these three parties with the killing of the deceased by their own acts and declarations. According to it, all three had threatened to kill Conley or that he would be killed shortly. Each was at the scene of the killing and armed. All had been seen together on that morning oiling and cleaning their guns. Being thus connected with the killing at the time and place of the tragedy, there was sufficient evidence of conspiracy to warrant the court in admitting the acts and declarations of the associates of the accused as original evidence against him, leaving to the jury the final determination as to whether there was or was not a conspiracy and whether, without regard to conspiracy, the accused was not a principal in the second degree and, therefore, guilty.

In this application of the law to the evidence found in the record, that part of the evidence which is favorable to the accused is not ignored. The discussion here relates only to the admissibility of certain evidence for the State. It is true, that the evidence for the State discloses the fact that Conley had sent for the accused to come to the woods where he was working, and that, while the shooting was in progress, he called to his son and told him to quit, and that it appears that the accused had business of his own on that morning in the woods near where Conley was killed. But these facts clearly do not preclude the State from submitting to the jury the evidence tending to criminate the accused. His having business there does not exclude the possibility of his having gone there with a criminal intent also. The fact that Samp Hammonds induced him to go into that locality to scale logs is not of that character either. Their close relation in point of time and place may have been a mere coincidence. His exclamation at the time, was favorable to him and was for the consideration of the jury, it being a part of the *res gestae,* but it was for the jury, and not the court, to say whether those exclamations and admonitions to his son were manifestations of what Wharton calls "voluntary individual wariness, seeking to manufacture evidence for itself." Whar. Ev., s. 259. Whether the language of Dave Prater was "Are you ready?" or, "Are you ready to go?" was for the determination of the jury, as was also the question whether the reply of the accused was merely an innocent answer to the interrogation or a previously arranged signal for the firing of the fatal shot, or whether he supposed the call

came from Samp Hammonds. The court could not exclude competent evidence for the State merely because of evidence tending to establish facts favorable to the prisoner. It is a fundamental principle that all competent evidence both for and against the prisoner shall go to the jury, whose duty and province it is to ascertain the facts.

It is contended with great persistency that the trial court erred in permitting the attorney for the State to ask certain questions and obtain answers thereto, in the cross-examination of Fannie Prater, the wife of Lum Prater. She had testified and retired from the stand and had been recalled by the defendant, and, upon the completion of her redirect examination, the cross-examination complained of proceeded as follows: "Ques. Who were you before you were married? Ans. A Hatfield. Ques. How many times have you been married? Ans. Twice. * * * * Ques. Who was your mother? Ans. My mother was married to a Blankenship. Ques. Who was she before she was married? Ans. She was a Taylor. Ques. And your father was a Hatfield? Ans. Yes, sir." Questions and answers unexcepted to and those to which objection was sustained are omitted. It is argued that this cross-examination discloses the illegitimacy of the witness by way of degrading her and thus exceeded the limit allowed in cross-examination. The witness was one whose testimony, if true, was highly important to the defense. Hence, it is argued that the discredit cast upon her by this fact, tending to degrade her, was highly prejudicial to the defendant. What motive may have prompted the attorney for the State to bring out this fact could be better determined by the trial judge who was present looking into the faces of the actors than here where we have nothing but the printed words of the parties. On the face of this printed matter the evidence would seem to be within the rule as tending to show the relationship of the witness to the parties whose acts were the subjects of inquiry on the trial and in whose favor she was testifying. It is always competent to show that. 29 Am. & Eng. Enc. Law, 770; Underhill on Cr. Ev., s. 248. This is so well established that it is useless to cite authority upon it. But, admitting that a further purpose was to show that the witness was of illegitimate birth, a fact over which she had no control and for which she was not responsible, does it follow that the court erred in permitting it to be brought out

on cross-examination? The authorities are almost unanimous in holding that facts and circumstances tending to degrade the witness for the purpose of affecting credibility are proper subjects of inquiry on cross-examination, and that the limit to which such inquiry may be carried is in the discretion of the trial court. 8 Enc. Pl. & Pr. 117-118.

To this it must be added that the witness always has the personal privilege of declining to answer such questions, unless they relate to relevant and material matters. *Cloyes* v. *Thayer,* 3 Hill (N. Y.) 564; *Southard* v. *Rexford,* 6 Cow. (N. Y.) 350; *Treat* v. *Browning,* 4 Conn. 408; *State* v. *Bacon,* 13 Or. 133; 57 Am. Rep. 8; *Clemens* v. *Conrad,* 19 Mich. 170; *Wilbur* v. *Floyd,* 16 Mich. 40; *Real* v. *People,* 42 N. Y. 270. By relevant matter is meant not merely that which is relevant as affecting the credit of the witness alone, but that which is material to the facts in issue. The witness may answer or not, as he pleases, but, if he does answer, the party propounding the question is bound by the answer, for a well known rule of practice forbids contradiction of a witness as to collateral matters. *State* v. *Sheppard,* 49 W. Va. 582; *State* v. *Goodwin,* 32 W. Va. 177; *Fries* v. *Brugler,* 2 Am. Dec. 60. Subject to the right of the witness to claim his privilege, it is in the sound discretion of the court to exclude or permit such cross-examination, and the exercise of such discretion is not reviewable, except in cases of manifest abuse or injustice. *Turnpike* v. *Loomis,* 32 N. Y. 127; *In re Lewis,* 39 How. Pr. Rep. (N. Y.) 155; *Wroe* v. *State,* 20 O. St. 460; *Com.* v. *Shaw,* 4 Cush. 593; *Odiorne* v. *Bacon,* 6 Mass. 185; *Miller* v. *Smith,* 112 Mass. 470; *Com.* v. *Liden,* 113 Mass. 452; *Cloyes* v. *Thayer,* 3 Hill (N. Y.) 564.

*Howel* v. *Com.,* 5 Grat. 664, holding that counsel for the prisoner "will not be allowed" to ask a female witness for the State whether she is not, or has been, or is reputed to be, unchaste, or whether her youngest child is not a bastard; and that it was proper for the trial court to inform another female witness that she was not bound to say whether she had been accused of theft and whether stolen articles had not been taken from her; and *Forney* v. *Ferrell,* 4 W. Va. 729, saying, "It is proper to ask a female if she had not married her last husband before the death of her first husband," may seem to conflict with these views. But the law as announced in the syllabi of those

cases must be read in the light of the cases as they were presented and the views there expressed in the opinions delivered. In each of those cases the Appellate Court only approved the act of the trial court, in excluding the evidence offered. As it was in the discretion of the trial court to do so, of course there was no error, and that is as far as these two cases can be said to go. Whether there was discretion to admit such evidence, as well as to reject it, cannot be said to have been decided, for the question was not raised. It cannot be fairly assumed that it was the intention to hold, against the great weight of authority, both English and American, that there is no discretion to permit such cross-examination, without any direct discussion of, or allusion to, the subject.

What will amount to such an abuse of the discretion as to make it reversible error, it is very difficult to say. Only two cases bearing directly upon the question have been found. One is *Smith* v. *Castles,* 1 Gray (Mass.) 108, and the other is *Madden* v. *Koesler,* 52 Ia. 692, and in neither of them is there a reference to any decided case or text book. Many of the cases hold that the case must be one of plain abuse. In view of the ample discretion allowed, the right of the witness to claim his privilege, the inclination of courts to advise him of his privilege, and the laudable aversion of courts to useless or unjust revelations of the degradation of witnesses, it is likely that few cases will, or could, occur for appellate interference, at the instance of parties. But as judges are not free from the infirmities of human nature, such cases may arise.

In this instance the witness did not claim her privilege. The objection was interposed, not by her, but by the attorneys for the plaintiff in error. This objection does not avail her. *People* v. *Brown,* 72 N. Y. 571. Had she done so, and, nevertheless, been compelled to answer, it would not be error of which a party could complain unless it amounts to manifest abuse of discretion on the part of the court. *Coyles* v. *Thayer,* 3 Hill (N. Y.) 564. In that case, the court say: "But the error is not available to plaintiff. The privilege belongs exclusively to the witness, who may take advantage of it or not at his pleasure. The party cannot object."

But the matter complained of is so remote in time, dating back to the birth of the witness, and in character, being a cir-

cumstance for which she is, in no sense, responsible, that it is
clearly not a legitimate subject to such cross-examination, al-
though it may possibly be classed as degrading matter within
the meaning of the law. Even if it is of that class, its tendency
is to disgrace without discrediting, and the court ought to have
excluded it because of its remoteness. Many of the courts se-
verely and rightfully condemn the effort to introduce evidence
of degrading conduct on the part of the witness himself, after the
lapse of considerable time, affording opportunity for reformation.
But in this view of the matter, the error is not sufficient to re-
verse, for mere error in the exercise of discretion is not palpable
abuse of it. If illegitimacy is not a subject of such inquiry at all,
the court should have excluded it, as being purely collateral,
but failure to do so is not reversible error, for no sensible jury
could have given the circumstance the slightest weight against
the credibility of the witness.

Numerous other questions were permitted to be asked and an-
swered over the objections of the attorneys for the defendant,
most of which relate to threats, declarations and actions of Dave
Prater and Lum Prater. These have been sufficiently disposed
of. Others related to what witnesses had heard Conley say
about the accused, Conley's habit as to swearing, the number of
times the accused had been married, who was the mother of
Joseph Prater, Jr., a witness, and her maiden name. A
careful examination of these fails to disclose any error
in reference to them, or any prejudicial error, to say the
least. The court refused to permit the accused to ask
a witness for the State whether a certain other witness
for the State had not been present in the court room during
the trial, assisting the prosecuting attorney and going out and
talking to the other witnesses for the State, and that is made a
ground of exception, but it is not insisted upon in the brief. A
fatal defect in the exception is that it does not show that the ac-
cused offered to prove any particular fact in response to the
question that was relevant and material. *Maxwell* v. *Kent,* 49
W. Va. 542; Hogg's Pleadings & Forms, 428. This would
vitiate it, had the proposition been to prove it by a witness for the
defendant. As it was sought to be brought out on cross-exami-
nation of a witness for the State it would certainly do so. On
its face, it amounts to a general complaint against the failure of

the court to enforce the exclusion and separation of the witnesses, a matter with which the jury had nothing to do, and is, therefore, irrelevant.

The indictment is in the statutory form and its sufficiency is so well settled that no authority will be cited upon it.  ·

Dave Prater escaped and has not been brought to trial.  The accused and Lum Prater elected to be tried separately, and when the accused was brought to trial he attempted to withdraw his motion for a separate trial, but it was resisted by the State, and the State desiring to try them separately, the court refused  leave  to withdraw, and this is made the ground of an unavailing exception.  In *Curran's Case,* 7 Grat. 619, it is held that, on a joint indictment against several, the State may elect to try them separately, and this has been approved in *State* v. *Roberts,* 50 W. Va. 422.  Under our statute, each defendant has a right to a separate trial if he so elect.  If no election is made either by the State or any of the defendants the trial is joint, but the defendant cannot insist upon a joint trial against the election of the State to try them separately, unless the court, in its discretion, refuses to permit the State to try separately.

At the instance of the State, the court gave ten instructions, all of which were objected to, but specific objections are made in the brief to only Nos. 1, 2, 3, 6, 9 and 10.

Instruction No. 1 tells the jury that upon an indictment for murder the accused may be convicted of murder in the first degree, murder in the second degree, voluntary manslaughter or involuntary manslaughter, giving in connection therewith the penalty in each case, except that of involuntary manslaughter, which is defined in the instruction as a misdemeanor, and erroneously stating the punishment of murder of the second degree to be confinement in the penitentiary not less than five nor more than ten years, instead of not less than five nor more than eighteen years.  One objection is that the instruction did not tell the jury they might acquit if the evidence waranted it.  This is not tenable, even if the court were bound to instruct the jury that they might find the accused not guilty, for the reason that instructions Nos. 9 and 13, given for the defendant, expressly told the jury they should find the accused not guilty unless they believed to a moral certainty and beyond a reasonable doubt that he was guilty.  If instruction No. 1 was incomplete, these and

other instructions, telling the jury expressly and impliedly that they might acquit, have supplied the deficiency. A further objection to this instruction is, that it did not define the several offenses designated in it, but the court certifies that counsel, in the argument, fully explained to the jury the elements of murder in its respective degrees and of voluntary and involuntary manslaughter. Whether this is sufficient to supply the alleged defect, it is unnecessary to say, for the reason that it is not perceived that the court was bound to define these offenses in the absence of a request. Had the court refused a request of that kind from the defendant, or incorrectly defined them at the instance of the State, there would be cause for complaint, but that did not occur. Hence, the exception cannot be sustained upon this ground. The error in giving the punishment of murder in the second degree was certainly not to the prejudice of the accused, for the jury refused to inflict the ten years confinement by finding a verdict of voluntary manslaughter. "A judgment will not be reversed for error which resulted in no prejudice to the party seeking to take advantage of it. The existence of non-prejudicial error in a case affords no ground for disturbing the judgment. There must be the element of prejudice. Errors discovered go for naught unless coupled with prejudice inseparably connected with it." 3 Cyc. 383 ; *Fant* v. *Lamon,* 27 W. Va. 229 ; *Clark* v. *Johnson,* 15 W. Va. 804.

Instruction No. 2 is in substance that, if the three Praters had an understanding or agreement whereby Conley was to be killed, and, in pursuance of such understanding or agreement, they went to the place with deadly weapons in their possession and without any, or upon very slight provocation, either of them gave to Conley a mortal wound from which he died, the accused is *prima facie* guilty of murder in the first degree and the necessity rests upon him of showing extenuating circumstances, etc. It is urged against this instruction that it should have stated that where a homicide is proven, the presumption is that it is murder in the second degree which the State may elevate to murder in the first degree, by establishing the characteristics of that crime, or the defendant may reduce to manslaughter. But an examination of the instruction shows that it is based upon the possibility of a finding by the jury from the evidence that the killing was done in pursuance of a conspiracy to kill the de-

ceased, and that it did not undertake to state the other proposition. While it is true that it was not contended that the accused actually did the killing, if he was found to be a party to it as a conspirator or a principal in the second degree, he was equally guilty with the actual slayer, and the instruction was equally applicable to him. It is also said that the instruction is bad because it failed to tell the jury that the defendant's presence at the time of the killing must have been for the purpose of carrying out a conspiracy previously formed. This, manifestly, rests upon the theory that there can be no conviction upon circumstantial evidence unless the facts proved exclude every reasonable hypothesis inconsistent with the guilt of the accused, a matter which is, in some sense, separate and distinct from the proposition put in the instruction complained of. The court is not supposed nor required to embody all the criminal law in an instruction. This phase of the case is covered, however, by defendant's instruction No. 9, which could have been made fuller and wider on that subject, had he desired it. The instruction complained of is correct as far as it goes and was extended to the apparent satisfaction of defendant himself. Hence, on this ground there is no room for complaint. But the instruction is not free from criticism. It is too general and abstract. It should have been made to conform to the evidence by saying if the jury believe that, in pursuance of the conspiracy, they all went to the place of the killing with deadly weapons and Dave Prater gave the deceased the mortal wound. However in the abstract, the instruction is correct and it is clear that the jury could not have been mislead in the application of it to the case in hand, which makes the error, if any, harmless. Again, it is hardly consistent to say that if the jury find certain facts, conclusively fixing guilt upon the accused, he may show extenuating circumstances, but this was favorable to the exceptor and affords him no ground of complaint.

Instruction No. 3 reads as follows: "On trial for murder, where a deadly weapon is used, if the person relies on self defense, the burden of proof is on the defendant and he must excuse himself by a preponderance of evidence." The first objection to this is that self defense was not relied upon by the accused and that the principle is not applicable on the trial of the accused because he did not do the killing. This is un-

tenable for the reason that, if the killing was excusable on the part of the slayer because done in self defense or in defense of his father, that defense availed the accused as well as his co-conspirator, because it took out of the case the element of crime, if found by the jury. Moreover, the defendant relied upon the principle. His instructions No. 8 and 8½ were based upon that principle, and stated in his behalf the law of self defense and the right of the son to protect his parent in danger of death or great bodily harm. The evidence of Lum Prater and the accused tended to show that when the fatal shot was fired, Conley's attitude and conduct were such as to indicate an intention to attack the accused with an ax. So that principle was invoked both in the evidence and the instruction for the defendant and he, therefore, has no right to complain because, at the instance of the State, the jury were instructed upon the law of self defence, if the instruction was correct. It is claimed, however, that the instruction is bad because it failed to state that while the burden of proving self defense is on the prisoner, it might be made out by the evidence for the State. It is true, that, as held in *State* v. *Manns*, 48 W. Va. 480, it stops short of the law, but the prisoner, upon all the instructions in the case, had the benefit of the law in full on the subject, for, in his instruction No. 8½, stating the right of Dave Prater to defend his father even to the extent of killing his assailant, if he had reasonable ground to believe and did believe that such killing was necessary, it is further stated "but of all this the jury must judge from all the evidence and circumstances of the case." All the evidence and circumstances of the case include the evidence for the State as well as for the defendant. That the instruction would have been made more perspicuous by omitting the words, self defense, and stating it as the defense of the father by the son, or the assistance of the father by the son in his self defense, is not overlooked in the disposition of the assignment of error. Nor does that make it bad. Technically, it is self defense and is treated as self defense and called self defense by the law writers. Whar. Cr. Law, s. 1024; 4 Blk. 186. Blackstone says: "Under this excuse, of self defense, the principal civil and natural relations are comprehended; therefore master and servant, parent and child, husband and wife, killing an assail-

ant in the necessary defense of each other respectively, are excused; the act of the relation assisting being construed the same as the act of the party himself." It is the principle known to the law as self defense, and if it be argued that the jury may have been mislead by its being called self defense, when in fact it was more strictly the right of defense of another under the principle of self defense, it is fully met by the elucidation of the principle as applied to the particular case in the two instructions given for the defendant.

Instruction No. 6 reads as follows: "The court instructs the jury that under the indictment for the offense wherewith they stand charged, that if either Joe Prater, Lum Prater or David Prater did murder Tom Conley, the defendant Joe Prater being then and there present, lending his countenance to the commission of said offense, they must find him guilty as charged in the indictment." Why this proposition should have been put in the abstract is not perceived. The same looseness of expression is found here that has been pointed out in some others but, for the reasons hereinbefore given, it is held to be harmless. The objection urged in the brief against the instruction is, that, as it tells the jury that if they find certain facts they must then find the accused guilty as charged in the indictment, such finding would be construed as a verdict of murder in the first degree, and as the jury would probably regard the word "murder" used in the instruction as synonomous with killing, it is in conflict with the legal presumption that where homicide is proven it is murder in the second degree, which the State may elevate to murder of the first degree by establishing by proof the characteristics of that crime. It is to be remembered, however, that the jury had been told in a former instruction that there were two degrees in murder and that they might find the defendant guilty of either, and the instruction that they must find him guilty as charged in the indictment did not bind them to find him guilty of any particular offense charged in it. Murder of both degrees was charged in that instrument and they had been told in their instructions that they might find him guilty of either, or of voluntary or involuntary manslaughter or acquit him. Hence, it is manifest that they were not mislead by this instruction, although it is very unskillfully drawn.

Instructions Nos. 9 and 10 which it is urged are bad, are upon the law of circumstantial evidence. In the first it is said, that circumstantial evidence is just as legal and just as effective as any other provided the circumstances are of such character and force as to satisfy the minds of the jury of the defendant's guilt. It does not say they must be satisfied beyond reasonable doubt but that omission is fully covered by instructions given for defendant. The other defines circumstantial evidence as being "the proof of such facts and circumstances connected with and surrounding the commission of the crime charged as tend to show the guilt or innocence of the party charged," and then says, "and if the facts and circumstances are sufficient to satisfy the jury of the guilt of the defendant, then such evidence is sufficient to authorize the jury to find the defendant guilty." The same omission as in No. 9 occurs here and the same explanation is applicable. It is urged against this instruction, however, that it is not enough that the circumstances tend to show guilt. That is true, but the instruction does not stop there. It goes on and says in addition to that that the facts and circumstances must be sufficient to satisfy the jury of the guilt of the accused. That fixes the degree of the tendency and clearly overcomes the objection. It is apprehended that what is meant here is that the court should have said the circumstances must be such as to exclude every reasonable hypothesis inconsistent with the killing of the accused, but, as has been shown, that is covered by an instruction given for the defendant, and it could have been, and would have been, made fuller if he had requested it. This effectually disposes of the objection in its entirety.

Examination of instructions Nos. 4, 5, 7 and 8 reveals nothing objectionable in them and nothing is argued against them in the brief.

Complaint is made because certain instructions asked for by the defendant were refused by the court. Instruction No. 18, so refused, is a statement of abstract propositions of law, extending over nearly a page of the record on the subject of extra judicial evidence and evidence acquired by the witness by mere casual observation, commenting on the weight and value of such evidence. A sufficient objection to this instruction is that it embodies merely abstract propositions of law without, in any way,

indicating to what particular evidence or kind of evidence in the case it is applicable and was, therefore, well calculated to mislead the jury. Observations by the court on the weight or value of evidence, in the form of an instruction or otherwise, are not permissible, as a rule.

Instruction No. 6, so refused, was to the effect that Joseph Prater, and not David Prater, was on trial and that the question before the jury was, not whether David Prater was guilty, but whether Joseph Prater was guilty beyond a reasonable doubt. The court was not bound to give this instruction because Instructions Nos. 9, 11 and others, given for the defendant, sufficiently covered that point.

Instructions Nos. 21 and 22, refused, were, in substance, that if the accused went to the place in which deceased was killed for a lawful purpose and that the deceased offered combat which the accused declined, and, at the time of the shooting, the accused called upon David Prater to desist from the shooting, the jury should take these facts into consideration along with the other evidence in determining the guilt or innocence of the accused. By admitting evidence of these facts the court permitted them to go to the jury for their consideration and it was unnecessary for the court to instruct the jury that they should consider them. It must be presumed that they did consider them as they were before the jury for that purpose. If, therefore, the instructions are free from the objection of giving too much prominence to the particular facts to which they relate and could have been given, the refusal of them was clearly without prejudice to the defendant.

Instruction No. 19, refused, after stating that the killing of Conley by David Prater and the presence of the accused at the time of the killing were not of themselves sufficient to convict the accused, proceeds as follows: "Before the jury can convict the defendant, they must believe beyond all reasonable doubt that the defendant Joseph Prater actually did the killing or actually assisted in the killing of said Thomas Conley, etc." This instruction was improper for it was not necessary to the conviction of the accused that he should have actually assisted in the very act of killing. It was sufficient to find that he had conspired with the slayer, or joined with him, for the purpose of killing the deceased, and was present at the time of the kill-

ing for the purpose of assisting in the actual killing, if neces-
sary to its accomplishment. This, the proposed instruction cut
out by its terms and was, no doubt, intended for that purpose.

Instruction No. 10, refused, is in part as follows: "The
court instructs the jury that the crime of being an accessory be-
fore the fact of the commission of any crime has two elements:
First, the accessory may be present, aiding or abetting or assist-
ing the principal, by words or otherwise. Second, the accessory
may, before the commission of the act in question, advise or en-
courage its future perpetration, by suggestions or commands or
persuasion." It then states that the trial in either case is gov-
erned by the same rules; that the State must show affirmatively,
and beyond reasonable doubt, that the accused did encourage and
advise the killing by his son; that if the prosecution depends
on circumstances to establish its case, it cannot rely upon a
vague, disconnected or indistinct chain of circumstances; that
the jury must demand full and complete proof of the actual ad-
vice and encouragement by direct testimony; or, if the evidence
be circumstantial, it must be of such a character and of such a
logical and reasonable train of events and circumstances, con-
nected with the advice and encouragement, that the jury, as
reasonable men, are led to believe and did believe beyond all
reasonable doubt that the accused did advise and encourage the
slayer in the commission of the crime and that the killing was
in pursuance of said advice and encouragement. At the in-
stance of the defendant, the court had already instructed the
jury that the accused could not be convicted on the indictment
as an accessory before the fact because he is not so charged in
the indictment. Thus, instruction No. 10 was calculated to im-
press upon the jury that the accused was an accessory before
the fact and not a principal of the second degree. Hence, it
would have been misleading, tending to an acquittal of the ac-
cused without regard to the evidence. It was, therefore, prop-
erly refused.

Instruction No. 12, refused, was in part as follows: "Mere
passive presence, by any person, however much he may there-
tofore have advised and encouraged the commission of an of-
fense; cannot justify his being punished as a principal in the
second degree. And the jury cannot find the defendant, Jos.
Prater, guilty as a principal in the second degree, unless he ac-

tively, by some overt act and actual assistance on his part of the principal in the first degree, contributed to the commission of the offense, charged in the indictment. And, unless the jury so believe from the evidence, beyond all reasonable doubt, that Joseph Prater did so actively and actually assist David Prater in the killing of Tom Conley, not by mere presence or words, or advice, but by force, violence or interference, or assistance, then they cannot find him guilty as principal in the second degree of the killing of said Conley." This is so obviously improper that comment upon it is hardly necessary. It was clearly intended to impress upon the jury that they could not find the accused guilty in the absence of evidence showing active participation in the very act of killing, which is not necessary at all, as has been clearly shown.

Instruction No. 20, refused, was to the effect that, in order to convict, the fact of the unlawful mutual combination must appear to the jury affirmatively, convincing them beyond reasonable doubt, etc., and that they must be convinced of the same beyond all reasonable doubt from the testimony produced to them, and then says, among other things, "Or else, they must believe from the evidence, beyond all reasonable doubt, and so find that the presence of the defendant, Joseph Prater, at the time of the killing of Tom Conley, was for the purpose of aiding, assisting or abetting the principal perpetrator, David Prater, and that he did actually, assist, aid and abet in the perpetration of the said killing, which must be an affirmative and not a negative fact. And, must appear to the jury affirmatively, from the testimony actually produced and proven on the trial and beyond all reasonable doubt; that the defendant, Joseph Prater, might possibly be guilty or probably is guilty will not suffice and does not warrant a verdict of guilty, but that he is actually guilty as charged in the indictment, of wilfully, deliberately and maliciously killing and slaying or wilfully, deliberately and maliciously assisting in the killing and slaying of Tom Conley, must affirmatively appear to the jury, from legal, competent testimony, and beyond all reasonable doubt, else they shall find the defendant not guilty." This, if good, is substantially covered by instructions Nos. 7 and 13, which were given for the defendant. That is sufficient reason for its refusal, but, in the absence of these instructions, its propriety as an instruction standing

alone is matter of grave doubt, to say the least, for it was not necessary that the jury should believe that the accused assisted in the act of killing and slaying the deceased by any act other than his mere presence, in pursuance of the common design, for the purpose of assisting, if necessary. The last clause of the instruction clearly imports that it was necessary for the jury to find more than that, in order to convict.

A motion to exclude the testimony relating to the declarations made by David Prater and Lum Prater in the absence of the accused, was overruled, and the court, in doing so, said: "I don't think I ought to give my reasons for this decision. I don't want to give any intimation how I regard it. I simply say I overrule the motion to exclude this testimony." Exceptions were taken to these remarks, and it is argued that they were prejudicial to the accused in the trial, for the reason that the jury "must have thought the reason why he did not desire to intimate an opinion, was that it would be hostile to the prisoner." On their face, these remarks amount to nothing more than a declination on the part of the court to state his reasons for overruling the motion. In them there is not a word by way of comment on the weight, value or character of the evidence. It is not intimated whether the court regarded it as slight or strong. All the jury could have reasonably inferred from what the court said is that he regarded the declarations complained of as admissible evidence. That they could and did, no doubt, readily infer from the admission of these declarations in the first instance. If the principle contended for here should be adopted, it is difficult to see how any verdict could ever stand, for the reason that the jury may always infer from the fact of the admission of the evidence that the court regards it as competent, relevant and material. There is nothing in this exception.

When the State had rested at about twenty minutes of 11 o'clock, the attorneys for the accused requested time in which to consult about the introduction of their testimony, indicating that they desired about an hour for that purpose. The court offered to give them ten minutes, but refused to allow more, which action of the court was excepted to, but it is not insisted upon in the brief. No error is perceived in this. If there was, it would not be sufficient to reverse under the rule of this Court in *State* v. *Madison,* 49 W. Va. 96.

What has been said, and what is to follow, concerning the evidence, embodies sufficient reasons for holding that there was no error in overruling the motion to exclude the evidence for the State.

On the action of the court in refusing to set aside the verdict, there is nothing to consider except the sufficiency of the evidence. The apparent inconsistency of the verdict, which was discussed and disposed of in the beginning of this opinion, is relied upon it in this connection. Enough has been said on the subject to cover it in full. But it may be added that, except for the prohibitory clause of the Constitution against putting a person in jeopardy more than once for the same offense, if this verdict were set aside and a new trial awarded, the second trial would be upon the same indictment and upon the same evidence and the accused might be convicted of any offense charged in the indictment and supported by the evidence. That prohibition only forbids conviction in the second trial of an offense of higher degree than that of which the accused was convicted in the first trial. It does not exclude the introduction upon the second trial of the evidence adduced in the first, tending to prove the higher offense, if it also tends to prove the lower offense for which the second trial is had. The second trial is upon the same indictment and on the same evidence, so far as it is relevant to the second trial, which is limited to the lower offense, although the evidence may also tend to prove both, because the lower offense is inclusive and, as it proves the higher one, it necessarily tends to prove the lower, which makes it competent on the second trial. That being true, it is to be considered here in passing in review upon the sufficiency of the evidence to support this verdict. As there is nothing in this objection, it remains to inquire whether the evidence is sufficient. The rule is that the verdict will not be set aside unless, after rejecting all the conflicting oral evidence of the exceptor and giving full credit to that of the adverse party, the decision of the trial court, in overruling the motion for a new trial and pronouncing the judgment, still appears to be wrong. *State* v. *Flanagan,* 26 W. Va. 116; *State* v. *Baker,* 33 W. Va. 319; *State* v. *Henry,* 51 W. Va, 283. The review of the evidence heretofore given in disposing of other assignments of error renders it unnecessary to repeat it here. The facts and circumstances testified to against the accused, if found

by the jury to be true, are legally sufficient to warrant the infer-
ence of guilt embodied in their conclusion recorded in their
verdict. It must be presumed that they did find them true, and
the court cannot disturb these findings nor the verdict simply
because there was testimony tending to establish other facts and
circumstances which, if true, might sustain the inference of the
innocence of the accused. Under the rule just quoted, the court
must reject all that in passing upon the sufficiency of the evi-
dence, when it is in conflict with the evidence for the State.
Such is clearly the character of most of the evidence relied upon
by the accused to repel the charge made against him. While it
is true that it appears from the evidence for the State, and must
be regarded as an established fact, that the accused went to the
place of the killing, or into the locality of the killing, at least,
for a lawful purpose, having been sent for by Conley for one
purpose, and urged by Samp Hammonds to go for another, and
this one particular fact indicates an intent, in going there, en-
tirely free from crime or fault, it must be remembered that it is
only a fact and not a theory of the case, for it stops short of
the whole case and it must be presumed that it stops short of
any reasonable theory that can be predicated upon all the facts
found by the jury from the evidence in the case. That he had a
lawful purpose in being there does not preclude his having had
also an unlawful and criminal purpose. Hence, it is not incon-
sistent with the theory of guilt. While the rule is that the facts
and circumstances essential to a conviction upon circumstantial
evidence must be established by full proof and must be con-
sistent with the hypothesis of the guilt of the accused and in-
consistent with any other hypothesis, as stated in *Flanagan's Case*,
cited, that rule does not require the setting aside of a verdict
founded in whole or in part upon circumstantial evidence simply
because one fact, consistent with innocence, co-exists with another
fact which the jury are warranted in establishing as an inference,
and which is inconsistent with innocence and tends to establish
guilt, especially when such facts are matters of intent and pur-
pose which do not, in any sense, preclude the existence of one
another, and the conclusion as to which is a matter of inference
rather than actual demonstration. The hypothesis or theory
which the jury must uphold and incorporate in their verdict and

which must be consistent with the guilt of the accused, and inconsistent with that of his innocence, must be an hypothesis, not an isolated fact which is not conclusive of the case.

For the reasons herein given, the judgment should be affirmed.

*Affirmed.*