# CHARLESTON

## STATE *v.* YOHO.

### Submitted March 24, 1908.    Decided March 31, 1908.

1. HOMICIDE—*Voluntary Manslaughter.*
     Upon an indictment against two for murder both may be convicted of voluntary manslaughter, no matter which fired the deadly shot.   (p. 251.)

2. SAME—*Aiding and Abetting.*
     One may aid and abet the commsision of voluntary manslaughter, and be convicted of that degree of homicide.   (p. 251.)

Error to Circuit Court, Ritchie County.

Luticia Yoho and Joe Yoho were indicted for murder. Joe Yoho was convicted of voluntary manslaughter, and on a subsequent trial Luticia Yoho was convicted of the same offense, and she brings error.

*Affirmed.*

FREER & ROBINSON and S. O. PRUNTY, for plaintiff in error.

CLARKE W. MAY, Attorney General, and HOFF & POWELL, for the State.

BRANNON, JUDGE:

This is the case of an indictment in the circuit court of Ritchie county charging Luticia Yoho and Joe Yoho with the murder of Harvey Yoho. Joe Yoho was tried separately first and convicted of voluntary manslaughter. Next Luticia Yoho was tried and convicted of voluntary manslaughter and sentenced to the penitentiary for four years. She brings the case to this Court.

The evidence shows that Harvey Yoho, father of Joe

Yoho, and husband of Luticia Yoho, was killed in his own house by pistol shots. His mouth was full of victuals when found dead on the floor. He must have just risen from the table. Many shots entered his body. He was shot full of holes, one piercing his heart. Five empty shells were found on the floor. It is contended that as Joe Yoho was convicted of voluntary manslaughter we must say that it was he who fired the shot. That was an independent trial. The verdict in that case did not bind the jury in the trial of Luticia Yoho to find that Joe Yoho killed his father. The second jury may have thought that the wife killed him. But let us say that Joe Yoho fired the shots. Then it is contended that as manslaughter does not have the quality of malice and premeditation or conspiracy, therefore Luticia Yoho cannot be convicted of manslaughter, but must go free. I think *State* v. *Prater*, 52 W. Va. 132, overrules this point. In that case of *State* v. *Prater* I had, for a time, question whether two persons could be convicted of voluntary manslaughter; or rather, as in that case it was clearly proven that Prater's son shot Conley, I had question whether Prater could be convicted of voluntary manslaughter. For a time I reasoned that the verdict against Prater, the father, found him guilty only of voluntary manslaughter, and I asked the question how he could premeditate or conspire with his son, when in voluntary manslaughter there is no premeditation, conspiracy or malice. But I came to the conclusion then, as I do now, that where two persons are together fighting another, though in a sudden affray in heat of blood, and one of them kills that third party, under such circumstances as to render that one who does the act guilty of voluntary manslaughter, the act being unlawful, both may be convicted of voluntary manslaughter. The act by both is unlawful. The act of the man who kills is unlawful, and the other is participating in that unlawful act. This position is abundantly sustained by authority as I now find. In *State* v. *Prater*, on page 138, JUDGE POFFENBARGER cites authorities to support this view. I have met with a good many additional authorities. *Polly* v. *Commonwealth*, a Kentucky case, found in 24 S. W. 7, is exactly like this case. The indictment charged two with murder. One was tried and convicted of manslaughter. Afterwards the other was convicted of manslaughter. The

court said, "But the appellant contends that as Williams did
the killing, and he was only convicted of manslaughter, he
cannot be convicted of aiding and abetting that crime. But
we think that one may aid and abet the crime of manslaugh-
ter." In *State* v. *Putnam*, 18 S. C. 175, 44 Amer. R. 569,
several were indicted for murder. The claim was that as
one had been convicted of manslaughter and did the shooting
the elements of manslaughter could not be attributed to the
others. It was held that, "An indictment will lie for being
present, aiding and abetting manslaughter." The court said
that being present, aiding and abetting was not identical with
an accessary before the fact. Why? Because he was pres-
ent acting. The Alabama case of *State* v. *Coleman*, 5 Por-
ter 32, holds that, "One may aid and abet another in the
commission of the offence of manslaughter, and be punishable
accordingly." The court founded itself on excellent com-
mon law authority. We quote. "Upon authority, it seems
unquestionable that there may be aiders and abettors in man-
slaughter; and Russell (1 vol. 456) lays it down, that 'in
order to make an abettor to a manslaughter a principal in the
felony, he must be present, aiding and abetting the act com-
mitted.' This learned author is sustained by Hale. So in
Hawkins, (1 vol. 102) it is said to be clear, that if a master,
maliciously intending to kill another, take with him his ser-
vants, without acquainting them with his purpose, and meet
and fight his adversary, and his servants then take part with
him, and kill his adversary, they are guilty of manslaughter
only; but the master, of murder. This distinction is doubt-
less, founded upon the fact, that there was mere participa-
tion in the act, without a felonious participation in the de-
sign—a distinction, founded in principle and recognized by
authority." *Rex* v. *Plumer.* "One may be convicted of man-
slaughter though he did not assist in actual conflict. If he is
engaged with another in an illegal undertaking, as in picking
a quarrel with intent to rob, and is ready to render aid to
the one who struck." *Stipp* v. *State*, 11 Ind. 62. "If the
principal in the second degree supposed that the intent of the
principal was only to beat, not to kill, he is guilty of man-
slaughter." *Brown* v. *State*, 28 Ga. 199. In *Freel* v. *State*,
21 Ark. 212, it was held upon an indictment against two per-
sons charging that the mortal wound was inflicted by one and

the other was present aiding and abetting, if the principal was guilty of manslaughter the other might be convicted of the same crime. I cite also *Hagan* v. *State*, 10 Ohio St. 459. Also Wharton on Homicide, 3d. Ed., §144. Authorities on this point are collected in 26 Century Digest, col. 166, sec. 109. Now, the law thus clearly allows Luticia Yoho to be convicted of voluntary manslaughter, though the offence of Joe Yoho was the same degree of homicide.

It is said that no participation by Luticia Yoho is shown. That is a jury question, and if there be some evidence to sustain the verdict we cannot set it aside. Let us see. It is not shown that she fired a shot, or which one did the deed; but all the circumstances and surroundings of the case show that both were present, and the evidence shows that Luticia Yoho had more motive than had her son to do the deed. Early on the morning of the homicide she said to Gray, "We have done a just deed." She said to Laird, "I consider we have done a just deed." On the same day of the murder after the inquest she asked if she could not give bond and not go to town, and Huff told her she could not. Then she said, "Well, you need not be afraid; I am not going to try to get away. I consider we have done a just deed." This is proven by Marion Dean. She said in his presence, that same day, that she had lived in hell for about ten years, and she expected to live in peace now for a while. No answer was made to this evidence. The prisoner gave no evidence. Three witnesses prove those declarations. She thus confessed that she and her son had participated in the homicide. Such was her declaration after the act, fresh after it, while her husband was lying in his blood on the floor of their home. I will add to this that she did not cry while her husband was thus still in death when the neighbors had assembled at the home. Evidence shows that she seemed unconcerned and indeed used profane language on that occasion. Such her declarations and conduct after the tragedy.

Now, let us next see whether any motive existed in Luticia Yoho for this deed before it was done. She was heard to say by Dr. Edgel that she was afraid Joe would kill Mr. Yoho. "Coming events cast their shadows before." She asked Edgel whether anything could be done with Joe if he would kill his father when he was mistreating her. This is important evidence to fix upon her premeditation. I repeat

that "Coming events cast their shadows before them." But this is not all. She made other declarations and threats on different occasions showing antecedent motive.

She said to Dr. Edgel, "I will die before I will have any more children by Mr. Yoho." She said to Mrs. Hardman, that "before she would have another child by Mr. Yoho she would kill him, and she hated him worse than a brute." Mrs. Lomon swears that on one occasion she heard Luticia Yoho in the presence of Mrs. Hardman, Mrs. Riggs and Mrs. Deem say, that she would not have any more children. "No," she says, "I will kill him first." Mrs. Deem swears that Luticia Yoho, on an occasion, was talking about her husband, and said she would stand an earthquake before she would yield to him, and that she would kill him before she would ever raise any more children by him. She further said that if she ever became pregnant again, he would think it a cyclone coming, and if it hit, it would have to hit, and if it killed, it would have to kill. She said that if Harvey Yoho would whip one of her children before her, it would not be long before he would be lying stiff and cold. This was a year before the murder.

This evidence shows that Luticia Yoho had strong animosity against her husband and was an active participant in his taking off. So the jury has found upon ample evidence. And if we could hold that there was question as to whether both of two persons could be found guilty of manslaughter, we would then say that the evidence is ample to show a case of murder against Luticia Yoho, as she was present, aiding and abetting and encouraging her son, if she did not herself do the shooting, and the jury has abitrarily and mercifully lessened the verdict, and we would not set it aside when we see that the evidence would have justified a verdict for a higher offence. When once a homicide is proven all present participating in it are presumed to be guilty of murder in the second degree.

There is no error in admitting evidence proving the appearance of the room showing blood spots on the floor and bullet marks on the wall. Of course, it is clear that the appearance of the room in which the shooting took place just after it is admissible.

Therefore we affirm the judgment.

*Affirmed.*