## CHARLESTON.

### STATE v. C. C. REEDY.

Submitted October 30, 1923. Decided November 20, 1923.

1. CRIMINAL LAW—*Instruction That if Either of Two Persons in
   Fight With Deceased Struck the Mortal Blow Both are
   Guilty Improper. When no Combination or Conspiracy is
   Shown.*

   Where, upon a trial for murder, the evidence shows that
   the accused and deceased entered into a fist fight, provoked by
   the accused, and after exchanging several blows, the accused
   is thrown to the ground by the deceased, and while the de-
   ceased is on top of the accused, W. struck the deceased on the
   head with a weapon, and there is no testimony showing, or
   tending to show, an understanding between the accused and
   W. that W. was to interfere; and there is no evidence to show
   that W. in any manner assisted or participated in provoking
   the quarrel between the accused and the deceased and there
   are no facts or circumstances from which a combination or
   conspiracy on their part can be reasonably inferred; it is
   error for the trial court to give an instruction which is as
   follows:

   > "The court instructs the jury that if they believe from
   > the evidence beyond all reasonable doubt that the defendant
   > C. C. Reedy and Taylor Walsh provoked a quarrel with the
   > deceased O. W. Shreeve. and that as a result thereof a
   > combat occurred between the said C. C. Reedy and Taylor
   > Walsh on the one side and O. W. Shreeve on the other, and
   > that during said combat either the said C. C. Reedy or
   > Taylor Walsh, without just cause or sufficient provocation,
   > struck the said O. W. Shreeve a blow on the head with a
   > deadly weapon, and that said blow was wilfully, deliberately
   > and maliciously struck by either the said C. C. Reedy or
   > Taylor Walsh, and that as a result of such blow the said
   > O. W. Shreve died within a year and a day from the time
   > said blow was delivered, and the jury should further be-
   > lieve from the evidence that both the said C. C. Reedy and
   > the said Taylor Walsh were present and acting in concert
   > at the time said blow was delivered, then, the jury are in-
   > structed that both the said C. C. Reedy and Taylor Walsh
   > would be guilty of the murder of the said O. W. Shreeve,
   > regardless of which one of them actually struck the fatal
   > blow." (p. 553.)

2. SAME—*Accused not Guilty of Murder Where While in a
   Fight With Deceased a Third Person Delivered the Blow
   Which Resulted in Death Unless Such Third Person had
   an Understanding to Assist Accused.*

   Where the accused, who brings about a quarrel with the
   deceased and a fist fight ensues between them, and another

person, in no way connected with the quarrel, interferes in the fight and strikes the deceased with a deadly weapon, which blow may be the proximate cause of the death of the deceased; the accused cannot be held guilty of murder by reason of said blow being struck, unless the person interfering had some understanding with the accused to interfere and assist the accused in the difficulty. (p. 558).

3.   SAME—*Defendant Entitled to Instruction Upon Reasonable Doubt That Injuries Received by Deceased Were Approximate Cause of Death.*

In a case where, in a difficulty, the deceased was seriously beaten and injured, and he lives for some three and a half months after the injuries were inflicted, a part of which time he attended to his usual work, and dies with apoplexy; the accused is entited to an instruction to the effect that the jury must believe beyond a reasonable doubt that the said injuries were the proximate cause of the death of the deceased, and that the apoplexy which was the immediate cause of his death, was not brought about by some cause other than the injuries he sustained in the difficulty.   (p. 555.)

LITZ, JUDGE, dissents.


Error to Circuit Court, Logan County.

C. C. Reedy was convicted of murder in the second degree, and he brings error.

*Reversed and remanded.*


*Minters & McNemar,* for defendant in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

McGINNIS, JUDGE:

This is an appeal from the judgment of the Circuit Court of Logan County, whereby the defendant was found guilty of murder in the second degree upon an indictment found against him for the murder of Dr. O. W. Shreeve, and the defendant was sentenced to confinement in the penitentiary for a period of ten years.

The defendant assigns the following errors in the judgment of the lower court:

"(1) The court erred in giving instructions
Numbers One and Two, as offered by the State in
the trial of the action; and,

"(2) The court erred in refusing to give In-
structions Numbers Four, Five and Seven, as of-
fered by the defendant in the trial; and,

"(3) The court erred in refusing to set aside
the verdict of the jury as contrary to the law and
the evidence and in refusing to grant the petitioner
a new trial; and,

"(4) The court erred in allowing improper
evidence to be introduced before and considered
by the jury over the objection and exception of the
defendant; and in refusing to allow the defendant
to introduce before the jury, legal, proper, com-
petent and material evidence in behalf of the de-
fendant."

On the evening of the 4th of July, 1921, the defendant
with six other men—Taylor Walsh, Les Stanley, John Chafin,
Claud Kitchen, John Kitchen and the driver of the car, Bill
Messingil, started from Logan, in a car, to go to the Mud
Fork of Island Creek, a short distance from Logan, where
they had heard there was to be a dance, but just at what
point on this creek the dance was to be, it seems they were
not informed; and at the time the difficulty took place, in
which Dr. Shreeve was assaulted and injured, two of the
party, Les Stanley and Taylor Walsh, had been making un-
successful inquiries as to the location of the dance. They ar-
rived at a point locally known as 16 store, about eleven
o'clock in the night and stopped the car about 30 feet from
the store porch.

A short time before these parties arrived at that point,
witness Wayne Curry had gone to the residence of Dr.
Shreeve, who lived about 200 yards above the store, to have
him go to attend a sick child of the witness. The doctor had
retired, and while he was getting ready to go, witness went
for his horse, which, it appears, was up a hollow, the mouth
of which was near the residence of Andy Curry and between
40 and 60 yards distance from the store. The understanding
between the witness and the doctor was that the witness,
after getting the horse, was to meet the doctor in front of

the residence of Andy Curry, which was between the doctor's residence and the store. Witness had some difficulty in finding the horse, and he was gone some 25 or 30 minutes before he arrived at this meeting point, and when he arrived he got off of the horse to wait for the doctor and about that time he saw a man standing in front of the store porch. This man proved to be Dr. Shreeve, the deceased, and from the point where the witness dismounted from the horse he saw the difficulty. It seems that about the time these parties arrived at the point where the car stopped some one of the party in the car saw a light moving down the creek in the direction of the store, and where these parties were, Taylor Walsh met the man carrying the light and inquired of him where the dance was and according to Walsh's testimony, he asked the man with the light: "Do you know where they are having a dance up here, or know anything about a dance up here?" He said: "No, sir, I don't know anything about it." He said, "It does not concern me, it is none of my business." Walsh and this man with the light, whom Walsh says he did not know at the time, came on down the road to the lower end of the store porch and there the man with the light stepped off the railroad and went up to the end of the store porch and set a medicine case, which he was carrying, down on the end of the porch, and Walsh went on down to the car where these other parties were. Some one in the party asked him who the man was and what he said and Walsh answered: "I don't know who he is, but I think it is the doctor, he didn't say anything there was any sense about. He is crazy or drunk or something." About that time, Reedy, the defendant, recognized him as Dr. Shreeve, and called and said: "Dock, come down here!" and the doctor said: "It ain't no further up here than it is from here down there, if you want to see me come up here." The defendant called to him again to come down there; and the doctor said, in reply to the second call, "I am not coming, if you want to see me come up here." The defendant then got out of the car and went over to where the deceased was standing, and immediately a fight started between the defendant and Dr. Shreeve.

The statement of witness Curry, taken in connection with the uncontradicted testimony of all the witnesses with reference to the identity of the parties (whom witness, at the time, did not recognize, but whom he describes as one having a striped shirt on, who proved to be the defendant, and one having a coat on, who was shown to be Taylor Walsh, and one in his shirt sleeves, who it is shown was Les Stanley) is to the effect that the defendant came around the corner of the store and went up to where the deceased was standing and struck him, and a fight ensued; that they exchanged a blow or two and then "clinched" and the deceased got the defendant down and while thus engaged, Taylor Walsh, who was a short distance behind the defendant when he came up to where the deceased was standing, struck the deceased on the head with something bright, and deceased either rolled off of the defendant or Walsh pulled him off, and about that time Stanley arrived upon the scene. These three, the defendant, Walsh and Stanley, withdrew from the point where the deceased was pulled off of the defendant some few feet, and apparently consulted for a few minutes and witness heard one of them say: "Don't do that, don't do that!" and that was all he heard said; that the defendant had something bright in his hand, and he came back and jumped on the deceased and beat him around, struck him several licks and left him between two railroad ties with his head across the rail, and when witness started back to where he was lying, the deceased got up and came meeting him. His shirt was all torn off of him and he was bloody all over. His eyes were already swollen and his face was swelling, and upon being asked who had beaten him up, he said: "Reedy and some more had jumped on him and beat him to death." Witness took the deceased to his home some 200 yards from that point.

Perry Hunt testifies that he examined the ground where the difficulty took place and found blood on the ground and on the railroad ties, it appeared as though a pint of blood had been spilled there; this witness saw part of the fight from a distance. He states that he saw some one of the combatants strike some one with something shiny which he took to be a pop bottle, but he does not identify any one.

When the deceased arrived at home he was bleeding profusely and his face and eyes were very much swollen and bruised, and he was sent to the Holden Hospital on that night and was soon after examined by the doctor and found to be very badly bruised and bleeding about the head and face. "His eyes were almost closed and his head was badly bumped and bruised, had knots on his head and on top of his head."

He remained in the hospital four or five days, in bed most of the time; his mental and physical condition was very much impaired. After he left the hospital and went to his home his physical and mental condition did not improve, and he went to the Hawes-Marple Hospital at Huntington on July 16, 1921, where he was examined on that day and proved to have symptoms of intercranial pressure, and was referred, by the examining doctor there, to the Kessler-Hatfield Hospital, to which institution he went immediately. Dr. Kessler, who examined the deceased and made an X-Ray examination and picture of deceased's head, says that he "found the bruises rather general, so to speak, in his face; as I remember, the right side had the worst wound—that is where the skin was cut—and extending rather deeply into the tissue over his right cheek." He further states that these wounds were apparently made with a blunt instrument. Upon being asked what said X-Ray examination revealed, he said:

> "It revealed a fracture of the frontal sinus—
> that is immediately over the right eye—and extending across a portion of the left frontal sinus—
> the right frontal sinus over the right eye and the nasal bone was fractured and broken in. The jury probably will know there is an air space, or space between the two bones, possibly a half inch in breadth. The outer bone was driven in against the posterior plate. The nasal bone, or bone of the nose, was driven back with the outer plate of the right frontal sinus, and the inner plate to the right cheek was broken—the antrum. There is another cell or air space in the bone that was broken in. Then he had a fracture just about across the center of the top of his head, extending slightly further to the left, if anything, than it was to the

right. There was a break in the bone or skull, a
fracture of the skull extending about two inches
in length.''

He further says that the fracture across the top of his
head extended to the inside of the skull, and ''Beneath this
fracture on top of the head there was considerable blood clot.
That, of course, was from a hemorrhage that took place un-
doubtedly when the wound was first inflicted.'' When asked
the question: ''State to the jury whether or not the wounds
and injuries you found upon your examination there were
sufficient to have produced death,'' answered, ''indirectly
they could.'' And explaining says, ''By the pathological
condition brought about by the effect of the injury later
on.'' He further said it would increase the blood pressure.
Dr. Lyon says that the injury described would increase
intercranial pressure and that in turn would cause an increase
in blood pressure and high blood pressure is apt to produce
apoplexy.

After Dr. Shreeve returned from the hospital at Hunt-
ington, which was approximately four weeks after his injury,
he resumed his work, but was at no time after the injury in
his normal condition, either mentally or physically; he how-
ever, attended to his professional calls until October 20, 1921,
when he was stricken with apoplexy and died on the next
morning. Dr. Shreeve, before this injury, was a strong man
both mentally and physically.

With these facts before it we think the jury was justified
in saying, by its verdict, that the injuries inflicted upon the
deceased in the difficulty described was the indirect cause of
his death. In the further consideration of this case, the next
pertinent question that necessarily arises is, under the facts,
was the jury justified in finding that the defendant, either
himself or by the aid of someone else, inflicted these injuries.

In considering this phase of the case we find that the
effect of the testimony of all the eye witnesses to the difficulty,
except Wayne Curry, is that the defendant is alone respons-
ible for these injuries inflicted upon the deceased. They all
state, in substance, that the defendant and the deceased were
engaged in a fight; that the deceased had the defendant down

on the ground; that Taylor Walsh pulled the deceased off of the defendant, and, after they had been separated, the defendant again assaulted the deceased; that Walsh did not strike the deceased, nor did anyone else, except the defendant, strike him. Walsh swears positively that he did not strike the deceased at any time during the difficulty. These witnesses entirely eliminate every other person from inflicting the injuries which caused the death of Dr. Shreeve, except the defendant. If their testimony is to be believed, no one else could have inflicted the injury described by Dr. Kessler in his testimony above referred to. The character and extent of these injuries to the deceased as a result of the difficulty doubtless caused the jury to reach the conclusion that the injuries were inflicted upon the deceased by the use of some deadly weapon.

Wayne Curry testifies that he saw the man with the coat on, who afterwards proved to be Walsh, strike the deceased with something bright, which looked like a quart bottle or a pistol, while the deceased had the defendant down and was on top of him. Perry Hunt testifies that he saw some one strike with some shiny object which he took to be a pop bottle. He was some five hundred feet from the fight and did not see the beginning, in fact only saw the one lick struck and he did not identify anyone.

The jury, being the sole judges of the facts and the credibility of the witnesses, had the right to scrutinize the testimony of all the witnesses, and to believe or disbelieve any statement made by any witness in the case, and to say that some statements made by a witness were true and that statements made by some witness were not true. The only witnesses who testified as to who struck the first blow in the difficulty were witnesses Wayne Curry, Taylor Walsh and the defendant himself, and their testimony is contradictory. Curry states that defendant struck the first blow, the defendant says that the deceased struck him first and Walsh states that the deceased struck at the defendant first, but the evidence fails to disclose any positive preconcerted arrangement by these men or any of them to kill Dr. Shreeve or to do him any bodily harm; and, unless the fact that Walsh

was following the defendant but a short distance behind him, at the time the difficulty took place, and that after the fight had commenced between the defendant and the deceased, and after several blows had been struck by each, and after the defendant had either been knocked or thrown down on the ground, and while the deceased had the defendant down on the ground, Walsh struck him, are sufficient facts for the jury to draw the conclusion that there was a conspiracy, there was none. We do not think that these facts are sufficient to establish a conspiracy upon the part of the defendant and Walsh to injure the deceased at the time Walsh struck the deceased; but it will be seen by the testimony of Curry that after Walsh pulled the deceased off of the defendant these three men, the defendant, Walsh and Stanley, walked off to one side about ten feet and evidently had some conversation among themselves, but the only thing that witness Curry heard said was that some one of the three said: "Don't do that! Don't do that!" He did not know which of them made these statements. After these men had withdrawn from the scene of the first encounter, the defendant returned and started the second trouble and it was in this last encounter that the deceased received the injuries described above, if the witnesses for the defense are to be believed, and if Wayne Curry's testimony, in reference to this difficulty, was true the evidence justified the verdict. According to Curry, Walsh struck the deceased one blow only and the injuries inflicted upon the deceased were evidently caused by some blunt instrument, and, from the number and nature of the wounds he had been struck more than one lick with such an instrument, and upon the evidence, this court would not disturb the verdict of the jury.

The most serious question raised is upon the instructions of the court.

State's Instruction number one is as follows:

> "The court instructs the jury that if they believe from the evidence beyond all reasonable doubt that the defendant, C. C. Reedy and Taylor Walsh provoked a quarrel with the deceased, O. W. Shreeve, and that as a result thereof a combat occurred between the said C. C. Reedy and Taylor

Walsh on the one side and the said O. W. Shreeve on the other, and that during said combat either the said C. C. Reedy or Taylor Walsh, without just cause or sufficient provocation, struck the said O. W. Shreeve a blow on the head with a deadly weapon, and that said blow was wilfully, deliberately and maliciously struck by either the said C. C. Reedy or Taylor Walsh, and that as a result of such blow the said O. W. Shreeve died within a year and a day from the time said blow was delivered, and the jury should further believe from the evidence that both the said C. C. Reedy and the said Taylor Walsh were present and acting in concert at the time said blow was delivered, then, the jury are instructed that both the said C. C. Reedy and Taylor Walsh would be guilty of the murder of the said O. W. Shreeve, regardless of which one of them actually struck the fatal blow.''

We fail to find, in the record, that the defendant and Taylor Walsh provoked a quarrel with the deceased, in fact there was no general quarrel at the beginning of the difficulty, unless it could be said that what passed between the defendant and the deceased before defendant left the car to go over to where the fight ensued was a quarrel, and, if it was, Taylor Walsh did not in any way provoke it. It appears, from the evidence, that the fight began as soon as the defendant got to the point where the deceased was standing. Doubtless the defendant was angered at the manner in which the deceased replied to him when asked to come down to the car where the defendant was, but that was personal between him and the deceased. There is no testimony showing that Reedy, the defendant, and Walsh had any understanding or agreement to do the deceased any harm, and the evidence all tends to show that the defendant started this difficulty. There is no testimony which shows, by inference or otherwise, that the defendant had any knowledge that Walsh was going to interfere; the testimony very strongly tends to show that, at the time the fight first started, the defendant did not intend to do the deceased any great bodily harm. He had, on his person at the time the fight started,

a .44 Smith and Wesson pistol and he did not attempt to use
it even after he was thrown to the ground by the deceased.
Malice and the desire to kill, if either entered his mind, it
was after he had been separated from the deceased, and when
he began the fight the second time for, up to that time, he had
not used or attempted to use a weapon, after the deceased had
been pulled or knocked off of him and after he and Walsh and
Stanley had turned aside and consulted, was the time the
bright object seen in his hand by Wayne Curry was used, if
used by the defendant. He doubtless imagined that he had
been insulted and he got out of the car for the purpose of
administering punishment to the deceased for this insult, and
as soon as he got to where the deceased was he struck him
with his fist and the fight started and he very soon ascertained
that the deceased was willing and able to take care of him-
self in a fight of that kind, and he was thrown to the ground
by the deceased, and at the time Walsh interfered, was
doubtless receiving severe punishment; we do not think that
there is any evidence showing a conspiracy between the de-
fendant and Walsh to do the deceased a bodily injury, before
the fight started. That the lick that Walsh struck the de-
ceased was independent of any understanding between him
and the defendant seems evident, and we therefore say that
this instruction is bad; that it was prejudicial to the de-
fendant, and that it was reversible error for the lower court
to give it.

In *Horton* v. *Commonwealth*, 99 Va. 848, cited by the state,
we find in Syllabus pt. 7:

> "To constitute an aider and abettor it is essen-
> tial that the aider and abettor share the criminal
> intent of the principal, and if any reasonable
> doubt exists as to the intention of a party in
> interfering in a fight between two other persons
> he can not be found guilty as an aider or abettor."

In *State* v. *Clifford*, 59 W. Va. 1, cited by the state, there
was evidence given that at least tended to show a conspiracy
between the Cooks and the deceased Turner:

> "Turner accompanied them from their home
> toward the place at which the assult was made very

shortly before it occurred, and was found at the place which the evidence indicates was appointed by the Cooks for their rendezvous. He was present while the assault and beating were in progress and near enough to render assistance. He was the father of the child concerning whom the original trouble had arisen. Two witnesses swear that he actually participated in the assault."

There can be no question about the law governing abettors or co-conspirators, where an offense is committed in pursuance of the conspiracy or understanding; that all conspirators who are present where the offense is committed, whether they actually participate in the actual commission of the offense or not, are principals is certain. The cases cited by the state in support of this instruction, while they all hold what we conceive the law to be, are not in point because the facts in the case do not permit their application.

The case of *Sullivan* v. *State*, 85 Miss. 149, is in point, and the court in that case holds: (Point 1 Syllabus)

"The principle that where parties combine to commit crime the law imputes the guilt of each to all thus engaged and holds all to be guilty of any crime committed by either in the execution of the common purpose is founded upon the idea that a common intent to do some unlawful act existed in the minds of the parties prior to the commission of the crime which results from the combination; hence an instruction which seeks to apply the principle in the absence of such common intent to do an unlawful act is erroneous."

This was a case where the defendant, Bill Sullivan, and his brother, Wilson Sullivan, were engaged in a fight, and Jack Sullivan, the son of the accused, upon being informed of the difficulty, went to the point where the fight was in progress and took part therein on behalf of his father, and stabbed and mortally wounded the deceased, and the court says in its opinion:

"If W. C. Sullivan and his son, A. J. Sullivan, had combined to commit any unlawful act on Wilson Sullivan, and in endeavoring to carry such

design into execution Wilson Sullivan met his death, then both Bill and Jack Sullivan were guilty of murder. And this would be true even though at the outset neither had intended to take his life, under the reason of the rule stated above."

"So again, if W. C. Sullivan, of his malice aforethought, intending to compass the death of Wilson, provoked a difficulty in the progress of which he incited his son Jack to slay Wilson, then W. C. Sullivan would be guilty of murder, though Jack, in the absence of a previous agreement, would be guilty of manslaughter only. But if there was no preconcerted plan between appellant and his son to commit any unlawful act toward or inflict any injury on Wilson Sullivan, and if the difficulty between appellant and deceased arose upon a mere chance encounter, occurring without previous concert or intention on the part of either, in which neither intended nor sought to take the life of his adversary, and Jack Sullivan recklessly and unnecessarily slew the deceased, this would not render appellant guilty of murder, because in such state of case there would exist on his part no intention to commit murder nor to intentionally incite its commission by another. And this would be true, no matter if appellant was the aggressor in the fist fight in which he was engaged with deceased. But the instruction now being considered is not based on any one of these propositions. It permits the jury to convict each of the actors for the act of the other, though each acted independently and without the knowledge of his co-actor."

Instruction number 4 offered by the defendant and refused by the court, is as follows:

"The court instructs the jury that after hearing and considering all the evidence, there is a reasonable doubt in their minds as to the real cause of the apoplexy resulting in the death of O. W. Shreeve, the prosecuting witness, that is whether apoplexy causing the death of O. W. Shreeve was due to the blow or blows hit by the defendant, or from some other cause, then you should find the defendant, C. C. Reedy, not guilty of murder, as charged in the indictment against him." ·

This instruction was doubtless refused by the court on the ground that there was proof of a conspiracy between defendant and Walsh, and that a blow struck by either or both would be sufficient to convict the defendant of murder, and this is the law; but, as we have held in discussing instruction number one given for the state, there was no evidence of such conspiracy at the time Walsh struck the deceased. This instruction, though awkwardly drawn, should have been given. The point raised by this instruction is a vital question in the case and the defendant had the right to have the jury instructed upon this point.

Instruction number 5, offered by the defendant and refused by the court, is abstract and is not drawn in such a manner as to point out to the jury the facts it is based upon, and in this case both Walsh and the defendant struck the deceased, according to witness Curry, and if the jury believed that the defendant contributed, hastened or accelerated the death of the deceased, then they would have been justified in finding him guilty of the homicide, and the court did not err in refusing it. *State* v. *Angelina*, 73 W. Va. 146.

The court did not err in refusing to give instruction number 7. There is no evidence showing that any other person struck the deceased, except the defendant and Walsh, this instruction was calculated to confuse and mislead the jury and should not have been given.

For reasons herein stated, the judgment is reversed, the verdict of the jury set aside and the case remanded for new trial.

*Reversed and remanded.*

LITZ, JUDGE, *dissenting:*

I cannot agree with the opinion or conclusion of the Court. The judgment of conviction for a cold blooded murder is set aside upon the theory (wholly unfounded) that the two criminal actors, the defendant and his confederate, Taylor Walsh, were independent participants in the commission of the crime. The Court seems to hold that neither of two persons jointly engaged in a criminal act is responsible for the conduct of the other, in the absence of *positive* proof of a formal compact or conspiracy. In this connection it

is said: "The evidence fails to disclose any *positive, pre-conceived arrangement* by these men, or any of them, to kill Dr. Shreeve, or to do him any bodily harm." This view of the law is entirely erroneous. "Proof of conspiracy, or the existence of a common design on the part of two or more persons to commit a crime may be *inferred* from the circumstances connected with the transaction." *State* v. *Prater,* 52 W. Va. 132. The evidence as presented in the opinion amply justified the jury in finding a common design on the part of the defendant Reedy and Walsh to commit the offense. The facts relating to this phase of the case, however, are imperfectly stated by the Court. It is said that Reedy and Walsh and their associates, on the night of the tragedy started from the town of Logan in a car to go "a short distance" to Mud Fork of Island Creek, where they had heard a dance was to take place; and that at the time of the difficulty Stanley and Walsh had been making unsuccessful inquiries in an effort to locate the dance. This would indicate that the party had gone only a "short distance" on a mission of innocent pleasure. The situation is quite the reverse. These men were absent from dark until long after midnight, traveling many miles through the mining districts of Island Creek in Logan county. After committing the murderous assault upon Dr. Shreeve, leaving him helpless and unconscious, they hurried away from the region of the alleged dance in a direction opposite the town of Logan, searching for moonshine liquor. From the evidence of John Chafin, one of the party, and witness for the defendant:

"Q. But didn't you know what you were going up Main Island Creek for? (*after the tragedy*)

A. Well, I figured I might find a little moonshine up there.

Q. That is what I am going to get at. Don't you know, as a matter of fact, that is what you went up Island Creek for?

A. That is what I went for . I don't know what the other boys went for.

Q. Didn't you all figure on getting some?

A. I don't know what they figured.

Q.    The moonshine you had been drinking had given out and you wanted more?

A.    I did.    I don't know about the rest of the boys."

Chafin, Reedy and Stanley admit they had been drinking intoxicating liquors on the day of the crime. The opinion takes no account of the moonshine element in the case, nor is reference made to any of the gang except the defendant as being armed with pistols. Moreover, the fact that he carried a "44 Smith & Wesson pistol" is mentioned incidentally only in palliation of his conduct. Walsh was asked on cross-examination, "You boys were all armed to the teeth on that night, almost, were you not?" His reply was, "I don't know about the teeth. I had two pistols myself." He describes one of his pistols as being a "bright, shiney, 38 special with pearl handles on it, six inch barrel with a two and a half dollar gold piece in the side of it."

The defendant admits that at the time he and his associates were leaving the scene of the crime, "It was something said about the whipping, and as well as I can remember it *I said that he* (Dr. Shreeve) *would probably look at the next man.*" This admission and specific evidence showing his readiness to join Walsh in chastising Dr. Shreeve clearly establish a communion of design on the part of Reedy and Walsh to avenge a fancied insult to the latter consisting of the Doctor's alleged indifference to Walsh's pretended inquiries concerning a dance. Chafin admits, on cross-examination, that when Walsh reported to Reedy the alleged insult the latter said in effect, "That is old Doc Shreeve. I will go over and see what he means by talking that way." Reedy and Walsh did not approach Dr. Shreeve to inquire about the dance, as is pretended. This they could have done while standing at the car only thirty feet from him. Moreover, neither Reedy nor Walsh, after starting from the car toward Dr. Shreeve spoke to him before beginning the attack.

The opinion states that, "After these men (Walsh and Reedy) had withdrawn from the scene of the first encounter, the defendant returned and started the second trouble, and it was in this last encounter that the deceased received the injuries described above." The inference from this state-

ment is that Walsh in no way aided, abetted or encouraged the defendant in the second assault. Such impression is wholly at variance with the facts. The witness Wayne Curry describes the situation at the time as follows:

"By that time (after the deceased had been struck on the head by Walsh) the third man was there—that made the fourth man with the Doctor—and they got up from that and went off, three of them, about ten feet from him. * * * * *And they all gathered around him then.* I made up my mind it was somebody robbing a fellow out there, and so when they went to leave him one fellow, this fellow with the striped shirt on, (Reedy), run his hands up like that and hit him in the face, and that throwed his head over the rail. I went back and looked at the blood on the rail next day. They left his head over the rail, so they went around the store and left him there. I started up the road then, when I saw them do that, and I thought they had killed him, and as I looked back I seen the Doctor scuffling trying to get up. The thought struck me then they were gone and I was out of danger then * * * His shirt was all tore off of him and he was bloody all over. His eyes were already swollen, his face was swelling. * * * * He said Reedy and some more had jumped on him and beat him to death."

This and other testimony clearly shows that the common design on the part of Reedy and Walsh to inflict punishment on Dr. Shreeve continued from the time of its inception before they left the car until the assault had ended, with Dr. Shreeve helpless and unconscious. After making the first assault together, Reedy and Walsh withdrew evidently for the purpose of determining between themselves how they should next proceed. As Walsh had already administered serious punishment upon Dr. Shreeve (who was unable then, as it appears, to offer further resistance), it was likely decided that Reedy should finish the job. Accordingly, he made the attack this time by using his "44 Smith & Wesson pistol," while Walsh stood by, encouraging the act. It was Walsh's grievance that prompted the common design on the

part of himself and Reedy to punish Dr. Shreeve. They left the car together to make the assault; Reedy leading the advance by only ten feet, while Walsh followed, carrying in his hand a "shiney" object (evidently the pearl handled, nickel plated pistol he admits to have had on the occasion), with which he struck and disabled Dr. Shreeve. After committing the crime, with one accord they departed together without offering relief to their victim. Notwithstanding these facts, it is said, "There is no testimony showing that Reedy, the defendant, and Walsh had any understanding or agreement to do the deceased any harm, and the evidence all tends to show that the defendant started the difficulty. *There is no testimony which shows by inference or otherwise that the defendant had any knowledge that Walsh was going to interfere."*

What is the effect of the holding in this case? It means not merely delay in the process of law enforcement, but the actual staying of the hand of justice in the punishment of the principals of a savage and brutal crime. No jury can say whether the wounds inflicted by Reedy or those produced by the weapon in the hands of Walsh caused the death of Dr. Shreeve; and because of the impossibility of determining this fact, a verdict against either of the participants would have to be set aside as being without evidence to support it under the rule of this decision. Having held that Reedy was not responsible for the acts of Walsh, as a basis of its final conclusion that the trial court had committed reversible error, this Court assumes that there was substantial evidence presenting the issue as to whether the wounds inflicted by the defendant or those produced by Walsh caused the death of Dr. Shreeve. A different view would render the ruling of the trial court harmless and therefore no ground for a new trial.